JOHNSON–BOWLES COMPANY,
INC., and Marlen Vernon
Johnson, Petitioners,

v.

DIVISION OF SECURITIES OF the
DEPARTMENT OF COMMERCE OF
the STATE OF UTAH, Respondent.

No. 900558–CA.

Court of Appeals of Utah.

Feb. 19, 1992.
Certiorari Denied June 17, 1992.

John M. Coombs and Craig F. McCullough, Salt Lake City, for petitioners.

R. Paul Van Dam and David Sonnenrich, Salt Lake City, for respondent.

Before JACKSON, ORME and RUSSON, JJ.

### AMENDED OPINION [1]

RUSSON, Judge:

Petitioners Johnson–Bowles Company, Inc., and Marlen Vernon Johnson (collectively, the Johnsons) appeal from a final agency order of the Division of Securities of the Utah Department of Commerce (Division), suspending the Johnsons' registration for one year and placing both on two years probation subsequent to their suspension. We affirm.

[1] This opinion replaces the opinion of the same name issued November 29, 1991 (175 Utah Adv. Rep. 29).

[2] A short sale, a common practice in the securities industry, is "a contract for sale of shares of stock which the seller does not own, or certificates that are not within his control, so as to be available for delivery at the time when under rules of the Exchange, delivery must be made." *Provost v. United States*, 269 U.S. 443, 450–51, 46 S.Ct. 152, 153, 70 L.Ed. 352 (1926). The goal of the broker-dealer is to purchase stocks for delivery at a reduced price compared to the outstanding contracts.

## I. FACTS

On August 10, 1990, following a formal hearing, the Securities Advisory Board of the Division of Securities issued an order suspending Johnson–Bowles's registration as an agent for one year, and placed both on an additional two years probation.

Prior to January 22, 1989, the Johnsons were involved in the practice of selling short[2] certain shares of U.S.A. Medical Corporation (U.S.A. Medical). As of January 22, 1989, the Johnsons were short 53,-500 shares of U.S.A. Medical. On January 23, 1989, U.S.A. Medical effected a ten for one forward split[3] of its securities, thus increasing the Johnsons' short position from 53,500 to 535,000 shares. Shortly after the split, the price of U.S.A. Medical's stock increased ten-fold to approximately one dollar per share, roughly the same price per share as before the split.

On February 6, 1989, the Johnsons received notice of a buy-in[4] from Otra Clearing Corporation (Otra) of 150,000 shares of U.S.A. Medical securities, giving the Johnsons until February 15 to effect delivery. At the same time, the Johnsons began to furnish the Division of Securities with information regarding alleged problems with U.S.A. Medical and its securities. On February 15, the Johnsons informed Otra in writing that they would not honor the buy-in notice, claiming that they considered U.S.A. Medical's common stock to be unregistered securities and, as such, refused to "engage or participate in an unlawful distribution of unregistered securities."

On February 16, 1989, Johnson–Bowles filed a 10b–5 securities fraud action in fed-

[3] The purpose of a stock split is to increase the amount of outstanding shares while the amount of capital remains the same. It is common for the price of the stock after a split to be divided by the factor of the split. For example, in a ten-to-one split, the price of each stock after the split would be one-tenth of the price before the split.

[4] A buy-in occurs when party "A" fails to deliver stock it owes to party "B" within a given period of time. Party "B" may then initiate a buy-in by purchasing the stock from another source and charging "A" the difference between the actual purchase price and what "A" had agreed to sell for.

eral court, seeking a preliminary injunction and declaration that Johnson–Bowles's outstanding contracts and obligations to certain brokerage firms and clearing corporations to whom Johnson–Bowles owed shares of U.S.A. Medical were void for illegality. On February 17, the court granted the temporary restraining order as to Midwest Clearing Corporation, a corporation upon which many broker-dealers rely for their own securities clearing activities and apparently the entity that concerned Johnson–Bowles the most, thus preventing Midwest from effecting any buy-ins against the Johnsons for ten days.

On March 1, 1989, following a hearing on the Johnsons' motion for a preliminary injunction, the federal district court made numerous findings of fact, including the following:

2. The Court finds that the stock of U.S.A. Medical was unlawfully issued, has never been registered with any proper regulatory authority, is not exempt from such requisite registration and has been and is continuing to be traded illegally.

3. The stock of U.S.A. Medical has been and continues to be traded as part of a fraudulent scheme and device to manipulate and artificially inflate the price of that stock in violation of the securities laws.

4. The Court finds, however, that the plaintiff, Johnson–Bowles, knew or should have known about the alleged irregularities as to non-registration, non-exempt status and illegal trading in the stock after it became a market maker, and it is charged with knowledge of these irregularities.

5. The Court finds that the relative burden between Johnson–Bowles and other parties as well as damage to the public interest has not been shown by a preponderance of the evidence and that there is a failure of burden of proof to establish those elements.

The court then entered an order denying the Johnsons' motion.

On the same date, the Utah State Division of Securities issued an order denying the availability of all transactional exemptions for U.S.A. Medical securities, pursuant to Utah Code Ann. § 61–1–14(3) (1989) of the Utah Uniform Securities Act, which order was made permanent on March 27, 1989. In addition, on March 6, the United States Securities and Exchange Commission (SEC) suspended trading in the securities of U.S.A. Medical for ten days, which order lapsed after the SEC did not renew it.

Also on March 1, the Johnsons received notice from Otra that it had effected its buy-in of 150,000 shares of U.S.A. Medical stock and that, pursuant to buy-in procedures, the Johnsons were responsible for the purchase price of that stock. On March 21, the Johnsons notified the National Association of Securities Dealers (NASD), of the notice from Otra. The letter from the Johnsons to the NASD stated in relevant part:

On March 1, 1989 at 2:00 p.m. (M.S.T.), Otra Clearing called, buying in 150,000 shares of U.S.A. Medical Corp. The buy-in price was $.70 based on guaranteed delivery of 148,000 (P.B. Jameson, seller) and the buy-in price of $.50, 2,000 shares (R.A. Johnson, seller).

It is Johnson–Bowles Company, Inc.'s position that these buy-ins were illegal. First, shares of stock in U.S.A. Medical Corp. were unlawfully issued, were never lawfully registered and do not qualify for any valid exemption under federal or state law. As such, any trading of or transaction involving U.S.A. Medical stock has been, would have been and is unlawful under Section 5 of the Securities Act of 1933, 15 U.S.C. § 77e, and Section 10 of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b).

Second, all open trades or outstanding contracts for the purchase or sale of shares of U.S.A. Medical Corp. are illegal contracts and therefore unenforceable. The enforcement or performance of any and all such open trades or contracts would constitute and serve to complete illegal trades and unenforceable contracts. This would violate securities law.

Sometime after the Division's March 1 order suspending exemptions for U.S.A. Medical securities, the Johnsons purchased a total of 397,900 shares of U.S.A. Medical securities from six Utah residents and one New York resident. The Johnsons stated that they purchased the U.S.A. Medical securities to satisfy outstanding contracts for the delivery of those securities to several broker-dealers and clearing corporations. Additionally, on March 20, 1990, the Johnsons purchased 54,000 shares of U.S.A. Medical from another source. Mr. Johnson testified that he made this purchase as a possible means to satisfy a pending NASD arbitration proceeding between Johnson–Bowles and Otra regarding the latter's buy-in. Mr. Johnson further testified that he later used the 54,000 shares as security for an outstanding accounting debt. As a result of the Johnsons' purchase of U.S.A. Medical securities, the Utah State Division of Securities determined that the Johnsons had engaged in dishonest and unethical conduct violative of the Division's March 1, 1989 order and other provisions of the law, and initiated an agency action against the Johnsons.

## II. PROCEDURAL HISTORY

On April 27, 1989, the Division initiated an agency action against both Mr. Johnson and Johnson–Bowles, naming each in a separate petition containing three counts. Count I alleged willful violation or willful noncompliance with agency rules. Count II alleged that Johnson and Johnson–Bowles had engaged in dishonest or unethical practices in the securities business. Count III alleged that Johnson and Johnson–Bowles had, in violation of Division rules, recommended to a customer "the purchase, sale or exchange of any security without reasonable grounds to believe that such transaction or recommendation is suitable for the customer based upon reasonable inquiry concerning the customer's investment objectives, financial situation and needs, and any other relevant information known by the broker-dealer." The Division subsequently amended its petitions, removing Count I and re-alleging Counts II and III of the original petitions.

On May 24, 1989, the Division brought a motion to convert the proceedings from informal to formal. Over the Johnsons' objection, the said motion was granted on July 14.

On July 3, 1989, the Johnsons brought a motion pursuant to Rule 12(b)(1) of the Utah Rules of Civil Procedure to dismiss the Division's proceedings against them, arguing that the Division lacked subject matter jurisdiction to discipline them. The Johnsons asserted that they had purchased the stock in order to comply with NASD rules, which carry the full force and effect of federal law, and therefore necessarily take precedence over state law. After a hearing, the motion was denied by an Administrative Law Judge (ALJ). Pursuant to Utah Code Ann. § 63–46b–12 (1989) and applicable Department of Commerce rules, the Johnsons filed for agency review of the denial of their 12(b)(1) motion by the ALJ, which request was denied by the Division director.

On September 27, 1989, the Johnsons filed a motion to dismiss the Division's amended petition for failure to state a claim. The Johnsons' motion was granted as to Count II of the amended petitions, but denied as to Count I, leaving the "dishonest and unethical practices" cause of action intact.

On November 28, 1989, the Johnsons filed a motion for summary judgment on the Division's amended petitions on several grounds. The Division filed a cross-motion for summary judgment. Both motions were denied by the ALJ. The Johnsons filed a request for agency review of the ALJ's denial of their motion for summary judgment, which request was denied.

On July 16, 1990, a hearing was held on the Division's amended petitions. On August 10, 1990, the Securities Advisory Board issued an order suspending the Johnsons' registration for one year and placing them on an additional two years probation. The Division director reviewed and approved the board's order, which action was affirmed by the director of the Department of Commerce.

### III. ISSUES

The following issues are raised on appeal: (1) Was the Division's March 1, 1989 order suspending exemptions for U.S.A. Medical securities valid at the time the Johnsons purchased the U.S.A. Medical securities? (2) Did an unconstitutional conflict exist between the Division's enforcement of its March 1 order and the Johnsons' obligations to complete such transactions under NASD rules? (3) Did the March 1 order impermissibly interfere with interstate commerce? (4) Did the Division's enforcement of its March 1 order violate the Johnsons' due process rights? (5) Was there sufficient evidence to support the Division's August 10, 1990 order? (6) Did the Division properly apply the law to the facts of this case in its August 10 order? (7) Was the sanction imposed by the Division unreasonable in light of the facts and the Division's past practices? (8) Were procedural errors made with regard to the Johnsons' numerous motions?

### IV. STANDARDS OF REVIEW

#### A. Findings of Fact

■ We review an agency's findings of fact under a "substantial evidence" test, and will not disturb such findings unless they are not "supported by substantial evidence when viewed in light of the whole record before the court." *Grace Drilling v. Board of Review*, 776 P.2d 63, 67 (Utah App.1989) (quoting Utah Code Ann. § 63–46b–16(4)(g) (1988)). Substantial evidence is something less than the weight of the evidence, but more than a mere scintilla of evidence, *id.* at 68, and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Idaho State Ins. Fund v. Hunnicutt*, 110 Idaho 257, 715 P.2d 927, 930 (1985)). The burden lies with the Johnsons as the complaining party to "*marshall* all of the evidence supporting the findings and show that despite the supporting facts, and in light of the conflicting or contradictory evidence, the findings are not supported by substantial evidence." *Id.* (citations omitted) (emphasis in original).

#### B. Application of Law to Facts

■ Prior to the adoption of the Utah Administrative Procedures Act (UAPA), Utah Code Ann. § 63–46b–16(4) (1989), our review of issues other than findings of fact turned on whether an issue was characterized as a conclusion of law or a mixed question of law and fact. *See Morton Int'l v. Auditing Div. of the Utah State Tax Comm'n*, 814 P.2d 581, 585 (Utah 1991). However, in *Morton*, the Utah Supreme Court readdressed the standard of review issue and concluded that:

> it is not the characterization of an issue as a mixed question of fact and law or the characterization of the issue as a question of general law that is dispositive of the determination of the appropriate level of judicial review. Rather, what has developed as the dispositive factor is whether the agency, by virtue of its experience and expertise, is in a better position than the courts to give effect to the regulatory objective to be achieved.

*Id.* at 586. The court stated that this type of analysis would not significantly impact upon review of agency interpretation and application of their own statutes because "[i]n many cases where we would summarily grant agency deference on the basis of its expertise, it is also appropriate to grant agency deference on the basis of an explicit or implicit grant of discretion contained in the governing statute." *Id.* at 588. Therefore, in order for us to determine the appropriate standard of review for the various issues raised by the Johnsons, we must first determine if the statutes involved grant the type of discretion to the Division that the *Morton* court described.

■ Deference to an agency's statutory construction should be given "when there is a grant of discretion to the agency concerning the language in question, either expressly made in the statute or implied from the statutory language." *Id.* at 589. In such cases, "we will not disturb the [agency's] application of its factual findings to the law unless its determination exceeds the bounds of reasonableness and rationality." *Pro–Benefit Staffing v.*

Board of Review, 775 P.2d 439, 442 (Utah App.1989); see also Tasters Ltd., Inc. v. Department of Employment Sec., 819 P.2d 361, 364–66 (Utah App.1991). On the other hand, "absent a grant of discretion, a correction-of-error standard is used in reviewing an agency's interpretation of a statutory term." Morton, 814 P.2d at 588; see also Mor–Flo Indus. v. Board of Review, 817 P.2d 328, 330 (Utah App.1991).

## V.  ANALYSIS

### A.  Validity of the Division's March 1 Order

The Johnsons claim that the Division's March 1, 1989 order suspending exemptions for U.S.A. Medical securities was not valid at the time they purchased the U.S.A. Medical securities. They assert that since the order was not renewed within ten days, it lapsed at that time. The Division responds that the March 1 order remained in effect and was made permanent at the discretion of the executive director on March 27, 1989.

■ In order to determine the proper standard of review to apply to the validity of the Division's March 1 order, we must first examine the statute in question to determine the amount of discretion that the legislature granted to the Division in making its orders permanent. See Morton Int'l v. Auditing Div. of the Utah State Tax Comm'n, 814 P.2d 581, 588–89 (Utah 1991). Utah Code Ann. § 61-1-14(3) (1989) grants the executive director blanket authority to "deny or revoke any exemption specified in Subsection (1)(h) or (1)(j) or in Subsection (2) [of section 61-1-14] with respect to:  (a) a specific security, transaction, or series of transactions...."  U.S.A. Medical securities fall within section 61-1-14(2), and therefore, the exemptions for such securities may be denied or revoked by the executive director. In addition, section 61-1-14(3) states: "If no hearing is requested and none is ordered by the executive director or division, the order shall remain in effect until it is modified or vacated by the executive director." Id. By its plain language, the statute grants broad discretionary powers to the executive director to either call for a hearing, modify or leave in effect the order that has been entered. Thus, we will not disturb the agency's decision unless it "exceeds the bounds of reasonableness and rationality." Pro–Benefit Staffing v. Board of Review, 775 P.2d 439, 442 (Utah App.1989); see also Morton, 814 P.2d at 587; Tasters Ltd., Inc. v. Department of Employment Sec., 819 P.2d 361, 364–66 (Utah App.1991).

■ According to the record, the Johnsons did not request a hearing on the March 1, 1989 order within the fifteen day period required by the statute, nor at any time thereafter. Further, the record indicates that there was no change in the status of U.S.A. Medical securities that would have allowed such securities to be traded legally. Thus, the executive director had the option of either continuing the order in effect, modifying or vacating it. The executive director chose in his discretion to continue the order in force. Such a decision was well within the agency's statutory authority and discretion, and thus, we conclude that it did not exceed the bounds of reasonableness.

### B.  Preemption

In the alternative, the Johnsons argue that the Division's order suspending all exemptions for U.S.A. Medical securities was never valid because it unconstitutionally conflicted with federal law, as embodied in the rules of the NASD. The Johnsons contend that their obligations as NASD members preempt any state law that would interfere with such obligations, and that since the NASD is governed by SEC rules, the rules of the NASD carry the full force and effect of federal law and necessarily preempt the operation of any state laws that may interfere with the operation of NASD rules. The Division responds that the Johnsons have not shown that there was any conflict between the Division's order and NASD rules, and even if such a conflict existed, the Johnsons have failed to show that such conflict would have to be resolved in favor of the NASD.

■ We need not address the Johnsons' argument that the NASD's rules carry the full force and effect of federal law because it is clear that Congress did not intend the creation and continued supervision of the SEC to preempt the states' abilities to regulate fraudulent securities schemes. "Consideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law." *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576 (1981) (citing *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). The United States Supreme Court has stated that:

> where Congress has not entirely displaced state regulation in a specific area, state law is preempted to the extent that it actually conflicts with federal law. Such a conflict arises when ... state law "stands as an obstacle to the accomplishment of the full purpose and objectives of Congress."

*Federal Deposit Ins. Corp. v. Bank of Boulder*, 911 F.2d 1466, 1472 (10th Cir. 1990) (quoting *Pacific Gas & Elec. v. State Energy Resources Conserv. & Dev. Comm'n*, 461 U.S. 190, 204, 103 S.Ct. 1713, 1722, 75 L.Ed.2d 752 (1983)), *cert. denied*, —— U.S. ——, 111 S.Ct. 1103, 113 L.Ed.2d 213 (1991). A state statute will therefore be held to be void to the extent to which it conflicts with a federal statute if, for example, "compliance with both federal and state regulations is a physical impossibility." *Maryland v. Louisiana*, 451 U.S. at 747, 101 S.Ct. at 2129 (quoting *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217–18, 10 L.Ed.2d 248 (1963)). Further, the state law will also be found to be void where it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)).

■ That a federal statute should preempt state law in a specific area may be evidenced in several ways. For example, "[t]he scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplant it." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947) (citing *Pennsylvania R. Co. v. Public Serv. Comm'n*, 250 U.S. 566, 569, 40 S.Ct. 36, 37, 64 L.Ed. 1142 (1919)); *see also Cloverleaf Butter Co. v. Patterson*, 315 U.S. 148, 156–60, 62 S.Ct. 491, 496–98, 86 L.Ed. 754 (1942). Further evidence of preemption may be found if an Act of Congress "touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Rice*, 331 U.S. at 230, 67 S.Ct. at 1152 (citing *Hines*, 312 U.S. at 66, 61 S.Ct. at 404). Also, evidence of preemption may be found by examining the "object sought to be obtained by federal law and the character of the obligations imposed by [the law]." *Id.* (citing *Southern R. Co. v. Railroad Comm'n*, 236 U.S. 439, 35 S.Ct. 304, 305, 59 L.Ed. 661 (1915)). Finally, the state policy may simply "produce a result inconsistent with the objective of the federal statute." *Id.* (citing *Hill v. Florida*, 325 U.S. 538, 549, 65 S.Ct. 1373, 1378, 89 L.Ed. 1782 (1945)).

■ As to whether state law is preempted in the case at bar, Section 78bb(a) of the Securities Exchange Act of 1934 states in pertinent part:

> Nothing in this chapter shall affect the jurisdiction of the securities commission (or any agency or officer performing like functions) of any State over any security of any person insofar as it does not conflict with the provisions of this chapter or the rules and regulations thereunder.

15 U.S.C. § 78bb(a) (Supp.1991). The Securities Act of 1933 contains similar language:

> Nothing in this subchapter shall affect the jurisdiction of the securities commission (or any agency or office performing like functions) or any State or Territory of the United States, or the District of Columbia, over any security of any person.

15 U.S.C. § 77r (1981). Moreover, "[s]tate securities laws operate in conjunction with

federal laws; federal laws do not supersede state laws." *E.F. Hutton & Co. v. Rousseff*, 537 So.2d 978, 980 (Fla.1989). Thus, section 78bb(a) can only be interpreted as an explicit indication by Congress that it expressly did not intend to control securities regulation to the exclusion of state law. To the contrary, Congress expressly granted power to the states to regulate securities. As further evidence that Utah's enabling statute, and the Division's order, did not in any way compromise the integrity of any federal laws, on March 6, 1989, the SEC also issued an order suspending any trading of U.S.A. Medical securities. Since both the Division and the SEC were acting in concert toward the same goal of preventing the fraudulent trading of securities, Utah's regulatory scheme in no way conflicted with federal law.

In summary, it is clear that Congress did not intend the Securities Exchange Act of 1934 to displace state law in the same area. It is also clear that Congress expressly gave the states the authority to regulate securities, especially securities that are being traded in a fraudulent manner. *North Star Int'l v. Arizona Corp. Comm'n*, 720 F.2d 578, 583 (9th Cir. 1983). Therefore, it is untenable to argue that the SEC would require the trading of a particular stock that a state has determined to have been traded in a fraudulent manner. Thus, compliance with both the federal and state law could not be a physical impossibility. The State law is designed to further the same objectives that Congress envisioned in creating the SEC. It cannot be said that Utah's regulation of a fraudulent security does not at the same time fulfill the purposes and objectives of federal law. It is therefore apparent that the Division's March 1 order did not conflict with federal law, but instead helped to further the very objectives of Congress in

promulgating the federal law. Accordingly, if the SEC does not preempt the operation of Utah's securities laws, a voluntary, self-regulatory organization such as the NASD that is governed by the SEC similarly cannot preempt Utah's securities laws. Therefore, we conclude that the Johnsons' assertion that the operation of the securities laws of the state of Utah are preempted is without merit.[5]

### C. Commerce Clause

The Johnsons also contend that the Division's order suspending all exemptions for U.S.A. Medical securities was invalid because it impermissibly affected interstate commerce, in violation of the Commerce Clause of the United States Constitution, which provides that Congress shall have the power to "regulate commerce with foreign nations, and among the several states...." U.S. Const. art. I, § 8. The Johnsons argue that the Division attempted to extend its order to NASD members outside of Utah, that the out-of-state NASD members affected by the Division's order do not conduct any business in the state of Utah, and that, as such, the Division has attempted to give its order unlawful extraterritorial effect. We disagree.

It is clear that Utah may apply its securities laws to operations that are conducted within this state, even if those laws affect, or are aimed at non-residents. *Lintz v. Carey Manor Ltd.*, 613 F.Supp. 543, 551 (D.C.Va.1985) (citing *Enntex Oil & Gas Co. v. Texas*, 560 S.W.2d 494, 497 (Tex.Civ.App.1977)). With regard to a state statute's effect on interstate commerce, the proper inquiry is whether "the statute regulates evenhandedly to effectuate a legitimate local public interest and its effects on interstate commerce are incidental unless the burden imposed on such commerce is clearly excessive in relation to the

---

5. Additionally, the Johnsons raise several procedural attacks on the Division and the ALJ that are premised on the argument that NASD rules preempt state law. These include: (1) the ALJ's denial of the Johnsons' motion pursuant to Rule 12(b)(1) of the Utah Rules of Civil Procedure, (2) the denial of the Johnsons' request for agency review of the ALJ's denial of their 12(b)(1) motion, (3) the ALJ's denial of the Johnsons' Rule 56 motion under the Utah Rules of Civil Procedure, and (4) the Johnsons' request for agency review of the ALJ's denial of their Rule 56 motion. Having determined that NASD rules do not preempt state law, these procedural arguments also fail.

putative local benefits." *Enntex Oil,* 560 S.W.2d at 497 (citing *Pike v. Bruce Church,* 397 U.S. 137, 142–43, 90 S.Ct. 844, 847–48, 25 L.Ed.2d 174 (1970); and *Huron Portland Cement Co. v. Detroit,* 362 U.S. 440, 443, 80 S.Ct. 813, 815–16, 4 L.Ed.2d 852 (1960)); *see also North Star Int'l v. Arizona Corp. Comm'n,* 720 F.2d 578, 583 (9th Cir.1983). Further, "[a] state is damaged if its citizens are permitted to engage in fraudulent practices even though those injured are outside its borders." *Enntex Oil,* 560 S.W.2d at 497 (citing *Rio Grande Oil Co. v. State,* 539 S.W.2d 917, 921–22 (Tex.Civ.App.1976)). Finally, it is not uncommon for state securities laws to cross state boundaries and have some ancillary effect on other states, and consequently raise potential issues related to the Commerce Clause.[6] Such laws are designed to serve two distinct public purposes:

> First, the laws protect resident purchasers of securities, without regard to the origin of the security. Second, the laws protect legitimate resident issuers by exposing illegitimate resident issuers to liability without regard to the markets of the issuer. "The states' efforts to advance these interests will always overlap when securities transactions cross state lines. The states' interests can be protected without preventing other states from protecting their own interests."

*Simms Inv. Co. v. E.F. Hutton & Co.,* 699 F.Supp. 543, 545 (M.D.N.C.1988) (quoting McClard, *The Applicability of Local Securities Acts to Multi–State Securities Transactions,* 20 U.Rich.L.Rev. 139, 141 (1985)).

Any interference with interstate commerce by the Division's March 1, 1989 order is merely incidental to the local benefit of preventing the trading of fraudulent stocks, or the trading of otherwise legal stocks in a fraudulent manner. Accordingly, any contention that the order as it applies to the Johnsons violates the Commerce Clause of the United States Constitution is without merit.

---

**6.** Such state securities laws are referred to as Blue Sky laws, and have consistently been upheld by both federal and state courts. *See, e.g., Simms Inv. Co. v. E.F. Hutton & Co.,* 699 F.Supp.

### D. Due Process Violations

▮▮▮▮ The Johnsons contend that the Division improperly interpreted its March 1, 1989 order as not only suspending exemptions for U.S.A. Medical securities, but also as prohibiting the purchase of such securities. The Johnsons further argue that "nothing in the Order, the Utah Uniform Securities Act, or [their] industry training and education" put them on notice that the mere purchase of U.S.A. Medical securities subsequent to the entry of the March 1 order would be interpreted as a violation of that order. The Johnsons contend that such a lack of notice violated their due process rights.

However, the Johnsons' argument misses the mark. The Division did not sanction the Johnsons for a direct violation of the March 1 order. Instead, the Johnsons were sanctioned for dishonest and unethical activities in light of the intent, scope, and purpose of the Division's order. The Division found that the Johnsons' activities "frustrated the Division's appropriate efforts to preclude trading in those securities and thus partially emasculated the effect of the March 1, 1989 Order." The Division found that such activities constituted a "dishonest and unethical practice" within the meaning of Utah Code Ann. § 61–1–6(1)(g) (1989), thus warranting entry of disciplinary sanctions. Accordingly, in order to determine whether there has been a due process violation here, we must decide whether the statutes, rules, general practices of the securities industry, or other facts provided the Johnsons with adequate notice that their conduct might be considered dishonest and unethical. *See Heinecke v. Department of Commerce,* 810 P.2d 459, 465 (Utah App.1991).

▮▮▮▮ Section 61–1–6(1)(g), under which the Division initiated its action against the Johnsons, authorizes the Division to suspend or revoke the registration of a broker-dealer if it finds that such an

---

543 (M.D.N.C.1988); *Arizona Corp. Comm'n v. Media Prods., Inc.,* 158 Ariz. 463, 763 P.2d 527 (App.1988).

order is "in the public interest" and that the broker-dealer has "engaged in dishonest or unethical practices in the securities business." Admittedly, the phrases "in the public interest" and "dishonest and unethical practices in the securities business" are broadly phrased standards, which may not have "a ready and precise meaning to those outside of the profession." *Heinecke*, 810 P.2d at 465. However, a general statutory standard governing professional conduct is acceptable for three reasons: "(1) The subject of professional performance is too comprehensive to be codified in detail. (2) Members of a profession can properly be held to understand its standards of performance. (3) Standards of performance will be interpreted by members of the same profession in the process of administrative adjudication." *Id.* (quoting *Vance v. Fordham*, 671 P.2d 124, 129 (Utah 1983)). Further, there is not a constitutional violation in the use of broad standards governing professional conduct, since such standards are not subject to "objections of vagueness that apply to penal laws[.]" *Vance*, 671 P.2d at 128. As we stated in *Heinecke:*

> In contrast to the unfairness in imposing criminal liability on a run-of-the-mill citizen under a statute which does not clearly proscribe the conduct complained of, as a result of their training, testing, and licensure, members of a profession are properly charged with knowledge of what conduct is inconsistent with their responsibilities as professionals notwithstanding some lack of precision or comprehensiveness in the statutes and rules governing their licensure.

*Heinecke*, 810 P.2d at 466.

Under the facts of the present case, it appears somewhat disingenuous for the Johnsons to argue that they were not on notice that the continued purchase of U.S.A. Medical securities subsequent to the March 1 order might be interpreted by the Division to be "dishonest and unethical." Beginning with the Division's March 1 order, the Johnsons were put on notice that the Division concluded that U.S.A. Medical securities had been traded as part of a "device, scheme or artifice," to defraud investors. The Division then ordered that

the availability of any and all transactional exemptions be denied. In light of the great efforts and pains that the Johnsons went to in order to bring into effect the Division's order, the Johnsons must be charged with the knowledge that purchases made subsequent to the order might be construed as dishonest and unethical.

Also on March 1, 1989, in response to Johnson–Bowles's motion for a preliminary injunction, the federal district court issued its findings of fact, conclusions of law, and order which stated in relevant part:

> 2. The Court finds that the stock of U.S.A. Medical was unlawfully issued, has never been registered with any proper regulatory authority, is not exempt from such requisite registration and has been and is continuing to be traded illegally.

> 3. The stock of U.S.A. Medical has been and continues to be traded as part of a fraudulent scheme and device to manipulate and artificially inflate the price of that stock in violation of the securities laws.

> 4. *The Court finds, however, that the plaintiff, Johnson–Bowles, knew or should have known about the alleged irregularities as to non-registration, non-exempt status and illegal trading in the stock after it became a market maker, and it is charged with knowledge of these irregularities.*

(Emphasis added). Moreover, there is evidence in the record from the federal district court hearing that, prior to the Division's proceedings, the Johnsons' legal counsel advised them to not buy or sell any shares of U.S.A. Medical securities if there was a suspected problem with the security's exemption.

Additionally, on March 21, 1989, the Johnsons themselves issued a letter to the NASD which stated in relevant part:

> It is Johnson–Bowles Company Inc.'s position that these buy-ins were illegal. First, shares of stock in U.S.A. Medical Corp. were unlawfully issued, were never lawfully registered and do not qualify for any valid exemption under federal or

state law. *As such, any trading of or transaction involving U.S.A. Medical stock has been, would have been and is unlawful* under Section 5 of the Securities Act of 1933, 15 U.S.C. § 77e, and Section 10 of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b).

Second, all open trades or outstanding contracts for the purchase or sale of shares of U.S.A. Medical Corp. are illegal contracts and therefore unenforceable. The enforcement or performance of any and all such open trades or contracts would constitute and serve to complete illegal trades and unenforceable contracts. *This would violate securities law.*

(Emphasis added). This letter plainly exhibits the Johnsons' knowledge that, subsequent to the entry of the Division's March 1 order, any transaction involving U.S.A. Medical securities, including the purchase of such securities, might be considered dishonest and unethical.

It is also significant to note that prior to the present appeal, the Johnsons argued to any forum willing to listen that U.S.A. Medical securities were being traded in a fraudulent scheme and that they could not be the subject of any legal transaction. For the Johnsons to now argue that they were not on notice that their purchases of U.S.A. Medical securities might be interpreted as dishonest and unethical is untenable. Therefore, we conclude that the Johnsons' due process arguments are without merit.

### E. Sufficiency of the Evidence

█ The Johnsons contend that the Division's findings of fact are unsupported by substantial evidence, and therefore clearly erroneous. As noted above, we will not disturb such findings unless they are not "supported by substantial evidence when viewed in light of the whole record before the court." *Grace Drilling v. Board of Review,* 776 P.2d 63, 67 (Utah App.1989) (quoting Utah Code Ann. § 63–46b–16(4)(g) (1988)). Moreover, the Johnsons have the burden of marshaling all of the evidence supporting the findings and showing that,

despite the supporting facts, and in light of the conflicting or contradictory evidence, the findings are not supported by substantial evidence. *See id.*

The majority of the Division's findings are merely a summation of a stipulation entered into by the parties. Aside from finding of fact fourteen, those few findings that are not directly supported by the stipulation are amply supported by testimony from the hearing on July 16, 1990. Thus, our discussion focuses on the Johnsons' argument with respect to the Division's finding of fact fourteen. That paragraph states:

On March 20, 1990, Respondent Marlen Vernon Johnson purchased 54,000 shares of U.S.A. Medical Corporation securities from Mr. Sax. During the instant proceeding, Respondent testified that he purchased those securities for an entity known as January Corporation as the means to possibly satisfy a pending NASD arbitration proceeding between Respondent Johnson–Bowles Company, Inc. and Otra Clearing, Inc. regarding the March 1, 1989 buy-in of U.S.A. Medical Corporation securities by Otra Clearing, Inc. On March 29, 1990 Respondent Marlen Vernon Johnson—through the January Corporation—sold 54,000 shares to a firm known as Sorenson, Chiddo & May.

After marshaling the evidence in support of this finding, the Johnsons argue that the following testimony is sufficient to refute the facts set forth in finding of fact number fourteen, and that therefore such finding is clearly erroneous: (1) Mr. Johnson testified at the hearing that the 54,000 shares of U.S.A. Medical were purchased during March 1990, to be used, *if necessary,* in an NASD arbitration dispute between themselves and Otra; and (2) Mr. Johnson further testified that he later used the 54,000 shares as a security interest for an outstanding accounting debt, and that such a transfer for security purposes only in no way harmed the public. The Johnsons' objection centers on the fact that, according to Mr. Johnson's testimony, the 54,000 shares were merely transferred as a security interest for an outstanding ac-

counting debt, and finding of fact number fourteen states that the Johnsons *sold* the 54,000 shares to an accounting firm. However, the Johnsons' objection to finding of fact number fourteen, while well-taken in a technical sense, misses the relevancy of that finding. The Johnsons are not being sanctioned for what they did with the 54,000 shares after purchasing them, although that in itself may be sanctionable. As discussed above, they are being sanctioned for dishonest and unethical conduct in the purchase of those shares, as well as the purchase of another 397,900 shares on various dates subsequent to the Division's March 1 order, and while that order was in force. What the Johnsons subsequently decided to do with the stock is inconsequential to the Division's determination that purchasing the stock was dishonest and unethical conduct violative of the Division's order. Even if we were to eliminate the objected-to portion of finding of fact fourteen from consideration, the Johnsons could clearly still be sanctioned by the Division for dishonest and unethical conduct in the purchase of those securities. Therefore, we conclude that whether the shares were sold or merely used as a security interest does not affect the outcome of the action and is, therefore, irrelevant.

### F. The Division's Application of the Law to the Facts

Having found that the Division's findings of fact are supported by substantial evidence, we next examine the accuracy of the Division's application of the law to the facts of this case, *Saunders v. Sharp,* 806 P.2d 198, 199 (Utah 1991) (citing *Grayson Roper Ltd. v. Finlinson,* 782 P.2d 467, 470 (Utah 1989); and *Scharf v. BMG Corp.,* 700 P.2d 1068, 1070 (Utah 1985)), which the Johnsons also dispute.

■■■■ As required by *Morton Int'l v. Auditing Div. of the Utah State Tax Comm'n,* 814 P.2d 581 (Utah 1991), we first examine the statute in question to determine the appropriate standard of review. *Id.* at 588–89. Under Utah Code Ann. § 61–1–6(1) (1989), the executive director of the Division "may issue an order denying, suspending, or revoking any agent, broker-dealer, or investment adviser registration *if he finds that* the order is in the public interest" and that "[the defendant has] engaged in dishonest or unethical practices in the securities business." *Id.* (emphasis added). We view the words "if he finds that" as granting to the Division significant latitude and deference. The Division is in a much better position than the legislature or this court to supervise the ongoing operation of the securities industry and determine what is in the public interest and which practices are dishonest and unethical. Therefore, we hold that such statutory language bespeaks a legislative intent to delegate the interpretation of what constitutes dishonest and unethical practices in the securities industry to the Division. *See Morton,* 814 P.2d at 588; (footnote omitted); *see also Utah Dep't of Admin. Serv. v. Public Serv. Comm'n,* 658 P.2d 601, 615–16 (Utah 1983) (agency's determination as to whether something is in the public interest is reviewed for reasonableness); *Salt Lake City Corp. v. Department of Employment Sec.,* 657 P.2d 1312, 1316–17 (Utah 1982) (agency granted discretion to determine what is "contrary to equity and good conscience"); *Tasters Ltd., Inc. v. Department of Employment Sec.,* 819 P.2d 361, 364 (Utah App.1991) (the words "as determined by the [agency]" indicate a grant of discretion). We further conclude that the statutes in question grant to the division the type of deference envisioned in *Morton,* and accordingly we will not disturb the Division's decision unless it "exceeds the bounds of reasonableness and rationality." *Pro–Benefit Staffing v. Board of Review,* 775 P.2d 439, 442 (Utah App.1989).

■■■■ The Division's March 1, 1989 order stated in relevant part:

IT IS HEREBY ORDERED, in accordance with the provisions set forth in § 61–1–14(3) of the Act, that the availability of any and all transactional exemptions contained in § 61–1–14(2) of the Act, be and hereby are, summarily denied.

In its findings supporting the March 1, 1989 order, the Division found that U.S.A. Medical was not registered with the State of Utah, and that it failed to qualify for any transactional exemptions. Thus, the Division stated in its August 10, 1990 order suspending the Johnsons registration:

> The proper scope and operative effect of the March 1, 1989 Order entered by the Division was to prohibit any trading of U.S.A. Medical Corporation securities within this state. Since those securities were neither registered nor exempt from registration and had been traded in a fraudulent scheme designed to manipulate the price of those securities, the just-stated order was duly entered to protect the public interest. It is specious to argue, as Respondents assert, that the order only prohibited the sale of U.S.A. Medical Corporation securities. Given the unlawful issuance of those securities and that the subsequent trading of those securities was tainted by fraudulent and manipulative practices, the proper scope of the March 1, 1989 Order must be broadly interpreted and in a manner consistent with the purpose for the issuance of that order.

Accordingly, the Division held that the Johnsons' actions "frustrated the Division's appropriate efforts to preclude trading in those securities and thus partially emasculated the effect of the March 1, 1989 Order" and clearly "constituted a 'dishonest or unethical practice' within the meaning of Section 61–1–6(1)(g)...." Because the Division sanctioned the Johnsons for dishonest and unethical conduct in light of the intent, scope and purpose of the Division's order, a matter clearly within the Division's discretion, we conclude that the Division's determination that the Johnsons' actions subsequent to the issuance of the March 1 order constituted dishonest and unethical activities was reasonable and therefore we will not disturb the Division's determination as such. *See generally Heinecke v. Department of Commerce,* 810 P.2d 459, 465–66 (Utah App.1991) (the application of broadly phrased ethical standards is properly left to the discretion of an agency).

■ The Johnsons argue, however, that an act cannot be dishonest or unethical unless it is also illegal. However, the scope of what constitutes dishonest or unethical conduct is much broader than that which is merely illegal. As we stated in *Heinecke:*

> In contrast to the unfairness in imposing criminal liability on a run-of-the-mill citizen under a statute which does not clearly proscribe the conduct complained of, as a result of their training, testing, and licensure, members of a profession are properly charged with knowledge of what conduct is inconsistent with their responsibilities as professionals notwithstanding some lack of precision or comprehensiveness in the statutes and rules governing their licensure.

*Id.* at 466. Therefore, the Division was within its discretion in concluding that the Johnsons' actions were dishonest and unethical. The Division's determination is reasonable and rational, and as such, we will not disturb this determination.

### G. Sanctions Imposed on the Johnsons by the Division

■ In addition, the Johnsons contend that suspending their license for one year and placing them on an additional two years probation was "arbitrary and ridiculous in comparison to the alleged violation." In response, the Division argues that such sanctions were reasonable, and that it did not abuse its discretion in imposing such sanctions.

Again, we examine the statute granting the Division the authority to impose sanctions under a *Morton* analysis in order to determine the appropriate standard of review. Utah Code Ann. § 61–1–6(1) (1989) states in relevant part:

> Upon approval by the executive director and a majority of the Securities Advisory Board, *the executive director may issue* an order denying, suspending, or revoking any agent, broker-dealer, or investment adviser registration *if he finds that* the order is in the public interest and that the applicant or registrant or, in case of a broker-dealer or invest-

ment adviser, any partner, officer, or director, or any person occupying a similar status or performing similar functions, or any person directly or indirectly controlling the broker-dealer or investment adviser:

.    .    .    .    .

(b) willfully violated or willfully failed to comply with any provision of this chapter or a predecessor act or any rule or order under this chapter or a predecessor act;

.    .    .    .    .

(g) engaged in dishonest or unethical practices in the securities business[.]

*Id.* (emphasis added). As noted above, this statute clearly gives the Division broad discretionary powers to either deny, suspend or revoke an agent's or broker-dealer's registration. Thus, the reasonableness of the sanctions imposed on the Johnsons by the Division is similarly a matter of agency discretion, and this court will not disturb the agency's decision unless it is clearly unreasonable or otherwise an abuse of that discretion. Utah Code Ann. § 63–46b–16(4)(h)(i) (1989).

■ The Division's sanctions were well within the agency's discretion and are appropriate in light of the willful nature of the Johnsons' violations. It would be difficult to imagine a more willful violation of the intent, scope and purpose of an order than that presented in this case. The Johnsons sought relief in federal district court, and when such relief was not forthcoming, they went to the Division of Securities to seek such relief. Having been granted the relief they sought from the Division, in the form of the March 1 order suspending all exemptions for U.S.A. Medical securities, they immediately turned around and began violating the intent, scope and purpose of the very order for which in large part they were responsible. As the Securities Advisory Board and the Division director stated in the Division's August 10, 1990 order:

entry of a disciplinary sanction in this proceeding is in the public interest and clearly warranted due to the [Johnsons'] non-compliance with the March 1, 1989 Order which was duly entered to regu-

late the trading of U.S.A. Medical Corporation securities. The record reflects that [the Johnsons'] dishonest and unethical conduct was driven by a desire to realize monetary gain and/or avoid financial loss and that [the Johnsons'] willingness to engage in trading the securities shifted over time, depending on whatever would promote [their] economic interests. Adherence to orders duly entered by the Division which govern the practices of broker-dealers and agents engaged in the securities business should not be a matter dictated by the potential for monetary gain. By reason of the serious nature of [the Johnsons'] misconduct, an appropriately severe sanction should be entered.

Further, at the Johnson's request that we take judicial notice of past disciplinary practices of the Division, we have reviewed these practices with regard to the suspension and revocation of registrations, and conclude that the suspension of the Johnsons' registration is well within the established practices of the Division. Thus, the sanctions imposed on the Johnsons by the Division are reasonable in light of the willful nature of the violations, and in conformance to past policies and practices of the Division.

### H. Conversion of the Proceedings from Informal to Formal

■ The Johnsons contend that the Division improperly converted the proceedings from informal to formal, thereby prejudicing their case. Our review of the Johnsons' argument reveals that the Johnsons have failed to comply with Rule 24(a)(9) of the Utah Rules of Appellate Procedure, which states that "[t]he argument shall contain the contentions and reasons of the appellant with respect to the issues presented, with citations to the authorities, statutes, and parts of the record relied on." *Id. See also English v. Standard Optical*, 814 P.2d 613, 618–19 (Utah App.1991); *Christensen v. Munns*, 812 P.2d 69, 72–73 (Utah App.1991); *Demetropoulos v. Vreeken*, 754 P.2d 960, 965 (Utah App.) (Jackson, J., concurring), *cert. denied*, 765 P.2d 1278

(Utah 1988); *Koulis v. Standard Oil Co. of Cal.*, 746 P.2d 1182, 1184–85 (Utah App. 1987).

In sole support of this argument, the Johnsons cite Utah Code Ann. § 63–46b–4(3) (1989), which provides:

> Any time before a final order is issued in any adjudicative proceeding, the presiding officer may convert a formal adjudicative proceeding to an informal adjudicative proceeding, or an informal adjudicative proceeding to a formal adjudicative proceeding if:
>
> (a) conversion of the proceeding is in the public interest; and
>
> (b) conversion of the proceeding does not unfairly prejudice the rights of any party.

However, this statute does not validate the Johnsons' argument, but rather it supports the action taken by the ALJ. Section 63–46b–4(3) grants discretion to the presiding officer to convert the proceedings from informal to formal if he or she believes the conversion to be in the public interest and that such conversion would not unfairly prejudice the rights of any party.[7] The Johnsons do not cite any authority or any portion of the record that would indicate that the Division abused its discretion in taking action under this section to convert the proceedings from informal to formal. Therefore, the Johnsons' appeal of this issue is disregarded for failure to comply with the court's briefing rules.

We have reviewed the remaining issues raised by the Johnsons with regard to their various motions before the Division and find them to be without merit. *Nephi City v. Hansen*, 779 P.2d 673, 676 (Utah 1989).

## VI. CONCLUSION

The Johnsons' claims on appeal are without merit. Accordingly, we affirm the Division's final agency order suspending the Johnsons' registration for one year and placing the Johnsons on two years probation subsequent to their suspension.

JACKSON and ORME, JJ., concur.

---

**7.** Given the additional procedural safeguards that attend a formal proceeding, Utah Code Ann. § 63–46b–6 to –10 (1989), it would be an unusual case indeed where conversion *to* a formal proceeding would prejudice a party sought to be sanctioned by an administrative agency.