[No. S058723. Jan. 4, 1999.]

DIAMOND MULTIMEDIA SYSTEMS, INC. et al., Petitioners, v.
THE SUPERIOR COURT OF SANTA CLARA COUNTY, Respondent;
JOANNE PASS et al., Real Parties in Interest.

1038

## COUNSEL

Wilson Sonsini Goodrich & Rosati, Steven M. Schatz, Terry T. Johnson, Marta Cervantes, Thomas J. Martin and Rebecca A. Mitchells for Petitioners.

Daniel J. Popeo, David M. Young; and Lawrence W. Schonbrun for Washington Legal Foundation and Allied Educational Foundation as Amici Curiae on behalf of Petitioners.

Brobeck, Phleger & Harrison, Thomas M. Peterson, Tower C. Snow, Jr., Robert P. Varian, John B. Missing, Sara B. Brody, Patrick Thomas Murphy and Rachael E. Meny for the Securities Industry Association, the National Venture Capital Association and the American Electronics Association as Amici Curiae on behalf of Petitioners.

Shearman & Sterling, Jeffrey S. Facter, David L. Anderson and Michele F. Kyrouz for Adobe Systems Incorporated as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

Milberg Weiss Bershad Hynes & Lerach, Alan Schulman, Mark Solomon, William S. Dato; Abbey, Gardy & Squitieri, Arthur N. Abbey, Jill S. Abrams, James J. Seirmarco; Bernstein Litowitz Berger & Grossmann, Daniel L. Berger, Jeffrey N. Leibell; Faruqi & Faruqi, Nadeem Faruqi; Stull, Stull & Brody and Jules Brody for Real Parties in Interest Joanne Pass et al.

Barack, Rodos & Bacine, Edward M. Gergosian, Kristi A. Shelton; Burt & Pucillo, Michael J. Pucillo and Wendy H. Zoberman for Real Party in Interest the Lauren Group.

James McMahon; Harold E. Dunbar; Berman, DeValerio, Pease & Tabacco and Joseph J. Tabacco, Jr., for the Pennsylvania State Employees'

Retirement System and the Missouri State Employees' Retirement System as Amici Curiae on behalf of Real Parties in Interest Joanne Pass et al.

Mooney, Green, Baker, Gibson and Saindon and Robert H. Stropp, Jr., for National Council of Senior Citizens as Amicus Curiae on behalf of Real Parties in Interest Joanne Pass et al.

Earl V. Brown, Jr.; and Judy Scott for the International Brotherhood of Teamsters and the Service Employees International Union as Amici Curiae on behalf of Real Parties in Interest Joanne Pass et al.

Rossbacher & Associates and Henry H. Rossbacher for National Council of Senior Citizens, the International Brotherhood of Teamsters and the Service Employees International Union as Amici Curiae on behalf of Real Parties in Interest Joanne Pass et al.

---

**OPINION**

**BAXTER, J.**—Corporations Code section 25400, a part of the Corporate Securities Law of 1968 (Corp. Code, § 25000 et seq.),[1] provides that it is unlawful in this state to make false statements or engage in specified fraudulent transactions which affect the market for a security when done for the purpose of inducing purchase or sale of the security or raising or depressing the price of the security. In short, it prohibits market manipulation.[2] Section 25500 creates a civil remedy for buyers or sellers of stock[3] the price of which has been affected by the forms of market manipulation proscribed by section 25400.

The principal question in this mandamus action is whether that civil remedy is available to out-of-state purchasers who bought or sold a stock

---

[1] All statutory references are to the Corporations Code unless otherwise stated. References to the Corporate Securities Law are to the Corporate Securities Law of 1968.

[2] " 'Manipulation' is 'virtually a term of art when used in connection with securities markets.' *Ernst & Ernst*, 425 U.S., at 199 [96 S.Ct. at 1384]. The term refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity. See, *e.g.*, § 9 of the 1934 Act, 15 U.S.C. § 78i (prohibiting specific manipulative practices); *Ernst & Ernst, supra*, at 195, 199 n. 21, 205 [96 S.Ct. at 1382, 1384, 1386]; *Piper* v. *Chris-Craft Industries, Inc., ante*, at 43 [97 S.Ct. at 950] (Rule 10b-6, also promulgated under § 10(b), is 'an antimanipulative provision designed to protect the orderliness of the securities market during distributions of stock' and 'to prevent stimulative trading by an issuer in its own securities in order to create an unnatural and unwarranted appearance of market activity') . . . ." (*Santa Fe Industries, Inc.* v. *Green* (1977) 430 U.S. 462, 476 [97 S.Ct. 1292, 1302, 51 L.Ed.2d 480].)

[3] The definition of "security" encompasses many other kinds of financial interests. (See § 25019.) Because this litigation, as is true of most litigation raising the issues addressed here, involves stock, we refer to "stock" rather than "security."

whose price was affected by market manipulation if the purchase or sale took place outside the State of California. The matter reached this court after the Court of Appeal summarily denied a petition for writ of mandate by which petitioners, defendants in the underlying lawsuit, sought to compel the Santa Clara County Superior Court to sustain their demurrer and dismiss a class action seeking damages under section 25500 for an alleged violation of section 25400. This court granted review and issued an order to show cause. We conclude that this action is properly brought under sections 25400 and 25500 and affirm the judgment of the Court of Appeal.

I

## The Superior Court Action

Plaintiff Joanne Pass filed the underlying action as a class action on behalf of all purchasers of the common stock of Diamond Multimedia Systems, Inc. (Diamond Multimedia) between October 26, 1995, and June 20, 1996, except the named defendants and their families. The named defendants are Diamond Multimedia, Hyung Hwe Huh, its senior vice-president and chief technical officer; William J. Schroeder, board member, president, and chief executive officer; Gary B. Filler, senior vice-president and chief financial officer; and Chong-Moon Lee, founder and chairman of the board. Lee, Filler, and Schroeder controlled Diamond Multimedia through their board positions and stock ownership.

### A. General allegations.

The complaint alleges[4] that all of the individual defendants were aware of adverse nonpublic information about Diamond Multimedia's business, finances, products, markets and present and future business prospects. Each was aware of and approved false statements issued by or on behalf of Diamond Multimedia during the class period.[5] The November 1995 stock offering which followed raised over $94 million for Diamond Multimedia

---

[4]For purposes of ruling on a demurrer, the court assumes the truth of all well-pleaded allegations of a complaint. The ability of the plaintiff to prove them is not in issue. (*Lazar* v. *Superior Court* (1996) 12 Cal.4th 631, 635 [49 Cal.Rptr.2d 377, 909 P.2d 981].)

[5]The allegedly false and misleading statements made during the class period included statements in Securities and Exchange Commission filings in conjunction with an offering of shares. Allegedly the filings overstated assets, and omitted information about significant problems with Diamond Multimedia products which the statement described only generally. Other allegations are directed to publicity generated by the company about new product introduction which allegedly was intended to offset concern that the stock offering would dilute earnings, false and misleading information about the company provided to securities analysts, who relied on that information in making buy recommendations and projecting increased earnings and a target price for Diamond Multimedia shares of $44 to $47 in their reports. The complaint included specifics regarding the "true" facts of which defendants were

while the individual defendants each received more than $2 million for the shares they sold, based on their insider information, at the artificially inflated price.

Diamond Multimedia is a manufacturer and supplier of graphics accelerator and modem products, having its executive offices and principal place of business in San Jose, California. Its shares are traded on the NASDAQ National Market system.[6] During the class period the shares rose from just under $20 per share on April 13, 1995, to over $40 per share in December 1995. At the time of a November 1995 offering, Diamond Multimedia sold 3,150,000 shares, and the individual defendants sold 315,041 shares at prices in the $30 per share range. In January through March 1996, the individual defendants sold 226,672 shares and in April and May 1996, they sold $136,250 worth of shares. The price of the shares had declined to the $20 per share range at that time. The price fell to as low as 9⅛ per share following a June 20, 1996, revelation by Diamond Multimedia that it would suffer a loss and subsequent admission that it would write down its inventory. ·

The plaintiff class includes California residents and others throughout the United States. Pass alleged that she had purchased 800 shares of Diamond Multimedia stock on May 17, 1996, at 18¾ per share. The place of purchase is not stated.

B. *The section 25400 cause of action.*

The complaint purports to state a cause of action under subdivision (d) of section 25400 which provides: "It is unlawful for any person, directly or indirectly, in this state: [¶] . . . [¶] (d) If such person is a broker-dealer or other person selling or offering for sale or purchasing or offering to purchase the security, to make, for the purpose of inducing the purchase or sale of such security by others, any statement which was, at the time and in the light of the circumstances under which it was made, false or misleading with respect to any material fact, or which omitted to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and which he knew or had reasonable ground to believe was so false or misleading."

---

aware, including customer dissatisfaction with and decreased demand for Diamond Multimedia products, canceled orders, "massive" return of products, unreliable suppliers, inadequate inventory control, overstated and obsolete inventory, and accounting practices which were not prepared in accordance with generally accepted accounting practices and were designed to falsely reflect continued financial success at a time when defendants allegedly knew that business was "collapsing" and revenues were declining dramatically.

[6]NASDAQ is an acronym for National Association of Securities Dealers Automated Quotation System.

In support of the section 25400 cause of action, the complaint alleges that defendants individually and pursuant to a conspiracy, or as aiders and abetters of one another, made untrue statements of material facts, omitted to state material facts necessary to make the statements not misleading, and engaged in acts, practices, and a course of conduct which operated as a fraud and deceit upon class members in order to sell their own Diamond Multimedia shares or induce the purchase of Diamond Multimedia stock by plaintiff and members of the class. Defendants sold or offered for sale Diamond Multimedia shares during the class period or willfully participated in such sales or offerings for sale. Defendants offered to sell or sold Diamond Multimedia shares by means of written or oral communications which included untrue statements of a material fact or omitted to state material facts necessary to make the statements not misleading. Members of the plaintiff class suffered damages because they relied on the integrity of the market when they purchased Diamond Multimedia shares at artificially inflated prices. Plaintiffs would not have purchased the shares at the price paid or at all had they been aware that the market price had been artificially and falsely inflated by defendants' misleading statements and concealments. At the time of their purchases the fair market value of the shares was substantially less than the price paid by class members.

Compensatory and punitive damages, pre- and postjudgment interest, attorneys and experts fees, and equitable or injunctive relief were sought.

Diamond Multimedia and all of the individual defendants except Lee (collectively Diamond Multimedia or defendants) demurred generally (Code Civ. Proc., § 430.10, subd. (e)) on the ground that the complaint did not state facts sufficient to constitute a cause of action as to either cause of action.[7]

The first of several bases for relief offered by Diamond Multimedia in support of its demurrer to the Corporate Securities Law cause of action was an argument that the complaint failed to plead the jurisdictional prerequisite for actions under sections 25400 and 25500 because there was no allegation that any stock purchases were made "in this state."[8] Legislative history materials accompanied the memorandum of points and authorities. At the hearing on the demurrer, Diamond Multimedia argued that the legislative

[7]Lee demurred specially. His demurrer on grounds of uncertainty was overruled. On the other grounds stated (particularity, standard of pleading), it was sustained with leave to amend, but the court ruled he could not be held liable under section 25400 for aiding and abetting or conspiracy.

[8]Diamond Multimedia also argued that the individual defendants could not be held liable under sections 25400/25500 and that Diamond Multimedia could not be held liable for statements not made in connection with the November 1995 stock offering. It sought to have all allegations based on those statements stricken.

history of sections 25400 and 25500 reflected an intent to protect California investors, i.e., California residents or persons who purchase stock in California.

The trial court overruled the Diamond Multimedia demurrer to the Corporate Securities Law cause of action.[9] It ruled that plaintiffs had adequately alleged that the defendants made misstatements for the purpose of inducing the purchase of Diamond Multimedia stock, but the individual defendants were not liable for aiding and abetting under section 25400, and Diamond Multimedia could not be held liable for statements that were not made in connection with the November 1995 stock offering.

This petition followed.

## II

### *Petition for Writ of Mandamus*

The petition for writ of mandamus seeks a peremptory writ directing the superior court to vacate the order overruling Diamond Multimedia's demurrer to the Corporate Securities Law cause of action and to enter a new order sustaining that demurrer. Diamond Multimedia seeks relief on the ground that the complaint fails to state a cause of action under sections 25400 and 25500 because it does not allege that plaintiffs are domiciled in California or that their purported Diamond Multimedia stock transactions occurred in California.

The dispute between defendants/petitioners and the real parties in interest (plaintiffs) centers on the introductory clause of section 25400: "It is unlawful for any person, directly or indirectly, *in this state*" to do any of the proscribed acts constituting market manipulation. (Italics added.) Plaintiffs argue that this language defines only the place at which the proscribed acts occur, and that the plain language of sections 25400 and 25500 does not limit the liability for violation of section 25400 to persons who bought or sold affected stock in California. They rely in part on this court's statement in *Mirkin* v. *Wasserman* (1993) 5 Cal.4th 1082, 1104 [23 Cal.Rptr.2d 101, 858 P.2d 568], that liability extends to " 'any person trading in the market.' " *Mirkin* is not dispositive, however, as the quoted statement was dictum and was not made with reference to the place at which a section 25500 plaintiff bought or sold stock. While *Mirkin* was a class action, apparently on behalf of a nationwide class, the action was for deceit and misrepresentation under

---

[9]The complaint also set forth a cause of action for violation of Civil Code sections 1709-1710 (deceit). A demurrer to the deceit cause of action was sustained with leave to amend for the reason that reliance had not been adequately pleaded.

Civil Code sections 1709 and 1710. Liability under sections 25400 and 25500 was not in issue. Our reference to civil remedies available under those provisions responded only to a claim that those remedies were inadequate and required privity of contract between the plaintiff and the defendant. The question here is one of first impression in this court.

Diamond Multimedia contends that "in this state" also defines the location at which a purchase or sale affected by the market manipulation takes place. It argues that it was the legislative intent to regulate and assert jurisdiction only over the offer and sale of securities in California and that the Corporate Securities Law regulates only intrastate securities transactions. Based on this reasoning Diamond Multimedia finally argues that the law imposes civil liability only for violations affecting intrastate transactions. Therefore, it claims, it is not enough that the seller is located in California. The purchaser must also be in California.

To reach this conclusion Diamond Multimedia reasons that while section 25500 does not state that the private cause of action is available only to persons who purchase stock in California, it refers back to section 25400. By doing so the Legislature incorporated the "in this state" limitation of section 25400. Therefore, section 25400 applies to persons who attempt to induce a purchase "in this state," while section 25500 provides a remedy for persons who purchase stock sold in violation of section 25400. Diamond Multimedia argues that, because section 25400 is intended to protect those who are induced to purchase stock in California, it is logical to conclude that section 25500 provides a remedy *only* for those who purchase stock in this state.

### III

### *Discussion*

Diamond Multimedia urges this court to construe the civil remedy afforded by section 25500 narrowly so that California will not provide a more attractive forum and afford more expansive remedies for market manipulation than does federal securities law. It does appear that recent procedural changes applicable to the federal securities laws have resulted in the filing of an increased number of nationwide class action lawsuits on behalf of corporate shareholders in California courts under California law.[10] We agree with petitioners that, as a result of the PSLRA, the reach of the California

---

[10]These changes were adopted in the Private Securities Litigation Reform Act of 1995 (Pub.L. No. 104-67 (Dec. 22, 1995) 109 Stat. 737, 1995 U.S. Code Cong. & Admin. News No. 1 (hereafter PSLRA)). The Report to the President and Congress on the First Year of Practice under the Private Securities Litigation Reform Act of 1995, authored by the Office of the General Counsel of the Securities and Exchange Commission (Apr. 1997) at pages 30-31 (reprinted in the PLI Corporate Law & Practice Course Handbook Series, No. B0-0013

Corporate Securities Law is increasingly important to shareholders, corporations, and the judicial system. The importance of the question is reflected in this court's grant of review and issuance of its order to show cause.

Whether California courts should entertain shareholder class actions based on alleged market manipulation which may not be maintained under federal law is a legislative policy decision, however. While the burden on California courts and corporate defendants may increase if actions predicated on violation of section 25400 are properly brought under California law, the function of this court is only to construe and apply the law so as to carry out the legislative intent which underlies it.[11] Defendants' policy-based arguments must be addressed to Congress and/or the Legislature.[12]

---

(1997)) states, relying in part on a National Economic Research Associates study, that in the 10 months following enactment of the law, 78 cases had been filed in state courts as compared with 48 for the prior year. Another study reported that 40 percent of securities class actions filed in the first 10 months of 1996 were filed in state courts. In 1995 slightly more than 20 percent were filed in state court. The state court filings after enactment of the act appeared to the author to be attributable to the availability of discovery while a motion to dismiss was pending. The Stanford Securities Class Action Clearinghouse reported that of 39 state court actions that were "stand alone," i.e., not parallel to a federal action, 24 were filed in California.

Three factors were identified as making state courts attractive—first, the holding in *Matsushita Elec. Industries Co.* v. *Epstein* (1996) 516 U.S. 367 [116 S.Ct. 873, 134 L.Ed.2d 6], that a state court dismissal of a securities fraud class action pursuant to a settlement could include a provision barring suit in federal court based on the same transaction. The other two factors relate specifically to California—the absence of a reliance requirement, and the availability of jurisdiction over many high technology firms whose stocks are sold during periods of high volatility and whose officers and directors often receive a large part of their compensation in company stock and stock options.

The Stanford University study, originally found only on-line (<http://securities.stanford .edu> [visited Jan. 5, 1999]), is now available in the Practicing Law Institute Corporate Law and Practice Course Handbook Series. (See Grundfest & Perino, Securities Litigation Reform: The First Year's Experience (Feb. 1997) reprinted at PLI Corporate Law & Practice Course Handbook Series, No. B4-7199 (Sept. 1997); see also Perino, Testimony before Subcom. on Securities, U.S. Sen. Com. on Banking, Housing & Urban Affairs (July 24, 1997) reprinted as A Census of Securities Class Action Litigation after the Private Securities Litigation Reform Act of 1995, PLI Corporate Law & Practice Course Handbook Series, No. B4-7199 (Sept. 1997).)

[11]As *Mirkin* v. *Wasserman, supra,* 5 Cal.4th 1082, demonstrates, however, nationwide class actions for market manipulation are permissible quite apart from the provisions of the Corporate Securities Law. Section 25400 is a preferred remedy because, unlike an action predicated on fraud or deceit, it is not necessary to demonstrate reliance on the defendant's false or misleading statement in the purchase or sale of the security.

[12]Insofar as class actions are concerned, recently enacted federal legislation, which is inapplicable to pending actions, may accomplish what defendants urge this court to do by adopting their construction of sections 25400 and 25500. The Securities Litigation Uniform Standards Act of 1998 (Sen. No. 1260, 105th Cong., 2d Sess. (1998)) amends section 16 of the federal Securities Act of 1933 (15 U.S.C. § 77p) and section 28 of the Securities

This action presents only a question. of law. Neither the wisdom of the legislation nor the merits of the underlying lawsuit are before us. We address only the proper construction of sections 25400 and 25500. As with any statutory construction inquiry, we must look first to the language of the statute. ■ "To determine legislative intent, a court begins with the words of the statute, because they generally provide the most reliable indicator of legislative intent." (*Hsu* v. *Abbara* (1995) 9 Cal.4th 863, 871 [39 Cal.Rptr.2d 824, 891 P.2d 804].) If it is clear and unambiguous our inquiry ends. There is no need for judicial construction and a court may not indulge in it. (*In re Waters of Long Valley Creek Stream System* (1979) 25 Cal.3d 339, 348 [158 Cal.Rptr. 350, 599 P.2d 656].) "If there is no ambiguity in the language, we presume the Legislature meant what it said and the plain meaning of the statute governs." (*People* v. *Snook* (1997) 16 Cal.4th 1210, 1215 [69 Cal.Rptr.2d 615, 947 P.2d 808].)

■ The central premise of Diamond Multimedia's argument is that section 25400 prohibits market manipulation with the intent to induce a purchase or sale of stock "in this state" and that, therefore, the section 25500 remedy is available only if the plaintiff purchased or sold stock in California. We are not persuaded that section 25400 can reasonably be read in the manner suggested by defendants. In arguing that it was the legislative intent

Exchange Act of 1934 (15 U.S.C. § 78bb) to prohibit class actions based on state statutory or common law by a private party "alleging— [¶] (1) an untrue statement or omission of a material fact in connection with the purchase or sale of a covered security; or [¶] (2) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security."

Section (c) of the act expressly provides, however: "The amendments made by this section shall not affect or apply to any action commenced before and pending on the date of the enactment of this Act." Notwithstanding the effort of Justice Brown to draw analogies between this action and the issues in *Guice* v. *Charles Schwab & Co., Inc.* (1996) 89 N.Y.2d 31 [651 N.Y.S.2d 352, 674 N.E.2d 282], and *Dahl* v. *Charles Schwab & Co., Inc.* (Minn. 1996) 545 N.W.2d 918, neither those cases nor the others on which Justice Brown relies holds that federal law preempts actions by shareholders for damages suffered as a result of market manipulation.

Far from restricting market manipulation actions to those brought under federal securities law, Congress has chosen both to permit continuance of pending class actions based on misrepresentation or omissions of material fact and use of manipulative or deceptive devices in connection with a purchase or sale of securities and to leave individual actions unrestricted. The suggestion that federal securities law already impliedly preempted all such actions under the Corporate Securities Law ignores this clear congressional recognition that, except to the extent that the 1998 act limits class actions, there is no preemption. Shareholders' rights under state and federal law are cumulative. By enacting only a class action limitation, when it could have barred all actions based on state law to recover losses caused by market manipulation, Congress has confirmed the independent force of state securities law. Had Congress believed that its goals could not be accomplished if suits based on state law were permitted or that any conflict between state a federal law existed, all actions based on state law, not simply class actions, would have been banned.

to regulate only intrastate securities transactions, Diamond Multimedia fails to acknowledge that section 25400 does not regulate securities transactions other than those described in section 25400 which are undertaken "in this state" to manipulate the market. It regulates market manipulation, not third party transactions affected by market manipulation. Section 25500 simply provides a remedy for third parties whose sale or purchase of stock is affected by unlawful conduct in California, making the remedy available without any express territorial limitation.

Section 25400 does not, as defendants/petitioners suggest, provide that the acts constituting market manipulation must be done with the intent to induce the purchase or sale of stock in California by a third party. Moreover, the manipulative conduct is unlawful under several provisions of section 25400 regardless of whether any third party purchase or sale actually occurs. Subdivision (d), under which this action has been filed, does not require that any transaction occur. It makes it unlawful in California to knowingly make false or misleading statements for the purpose of inducing the purchase or sale of stock.

The language of section 25400 is very clear. It states: "It is unlawful for any person . . . in this state" to engage in any of the conduct described thereafter. Thus, it is unlawful under subdivision (a) of section 25400 for a person or entity in California, for market manipulation purposes, to engage in "wash sales," specifically stock transactions which do not involve a change in beneficial ownership, or entering buy or sell orders knowing that other orders of the same size at the same price are being made at the same time. Under subdivision (b) it is unlawful in California to make a series of stock trades to create the appearance of active trading in the stock or to raise or depress the price of the stock when done to induce a purchase or sale. Subdivision (c) makes it unlawful for broker-dealers or persons offering to sell or buy a stock in California to induce a purchase or sale through "tipster sheets," i.e., by circulating information that the price of the stock may rise or fall because of market operations conducted for the purpose of raising or depressing the price. Subdivision (d) makes it unlawful in California for sellers or buyers of stock to make false or misleading statements of material facts for the purpose of inducing a purchase or sale.[13] Finally, subdivision (e) makes it unlawful in California for any person for consideration received from another to induce a purchase or sale of stock through tipster sheets.

[13]Contrary to the assertion of amici curiae Washington Legal Foundation and Allied Educational Foundation, an out-of-state securities seller may not be found liable under plaintiffs' construction of section 25400 if, while attending a one-day conference in California, the person omits to state a material fact about a security. Civil and criminal liability under section 25400 attach only if a person omits a material fact for the purpose of inducing the sale or purchase of the stock with knowledge that the omission was false or misleading.

Diamond Multimedia argues, however, that "in this state" should be read to modify the intent provisions of section 25400, not simply describe the location in which the proscribed conduct must take place—that a defendant must be shown to have intended to induce the purchase or sale of stock by others "in this state." As so modified, it would follow in Diamond Multimedia's view that section 25500 provides a remedy only to those persons who purchase or sell affected stock in California.

Diamond Multimedia suggests that this proposed construction of sections 25400 and 25500 would further the legislative intent that the law protect California domiciliaries—even those who purchase stock outside California—inasmuch as section 25008 deems out-of-state purchases by California domiciliaries to be made in this state. That is true only if the stock is delivered to the purchaser in California, however. (§ 25008, subd. (a).) Thus a resident of California who purchased Diamond Multimedia stock in Nevada during the class period might have no recourse under the Corporate Securities Law, while a Nevada domiciliary could seek relief under the law if he or she used the services of a California broker to complete the purchase in California.

Moreover, the language of sections 25400 and 25500 is not susceptible to this transposition of the phrase "in this state" in the manner suggested by petitioners. As plaintiffs note, even were we to transpose the "in this state" limitation in section 25400 as suggested by defendants, engaging in any of the conduct described in subdivisions (a), (b), and (d) of section 25400 for the purpose of inducing the purchase or sale of stock in California would still constitute a violation of that section regardless of whether any stock was sold or of the location at which other persons actually purchased or sold the stock. Reading section 25400 as suggested by defendants would not preclude suit under section 25500 by persons who purchased affected stock outside of California because section 25500 creates liability for any willful violation of section 25400 to "any" person who buys or sells stock at the artificially inflated or deflated price.

Only if one accepts defendants' additional thesis that because violation of section 25400 requires intent to induce a sale or purchase of stock in California and section 25400 is intended to protect only persons who purchase or sell stock in California, could we conclude that only those persons may exercise the section 25500 remedy. Section 25500 would thus incorporate the "in this state" restriction petitioners read into subdivision (d) of section 25400. Acceptance of this theory would necessitate not only transposing the "in this state" restriction from the introductory sentence which refers to the conduct proscribed by section 25400, but also ignoring the

section 25500 creation of liability to "any person" who purchases or sells affected stock.

Were we to read section 25400 as suggested by defendants, we would have to assume that the Legislature did not intend the Commissioner of Corporations, who also has power to enforce section 25400 (see § 25530 et seq.), to enjoin manipulative conduct by California licensed stockbrokers and dealers whose intent is to affect the national market in a stock or to enjoin such conduct before any transactions in the stock are affected by the conduct.

We would also have to overlook the impact of that reading on criminal prosecution for violation of section 25400. The legislative intent that subdivisions (a), (b), and (d) of section 25400 define conduct that is unlawful "in this state" and that violation of those subdivisions occurs regardless of whether a third party California transaction results is reflected in section 25540, subdivision (b). That section provides felony criminal penalties for "[a]ny person who willfully violates Section 25400, 25401, or 25402." If intent to induce a purchase or sale of stock in this state and a transaction in this state were elements of the violation, criminal prosecution of a person who sought to influence the price of stock on a national exchange would not be possible. The statute does not impose the limitations petitioners suggest. The conduct proscribed in subdivisions (a), (b), and (d) of section 25400 is criminal if, in California, the defendant acted with the intent to induce any purchase or sale of stock regardless of whether it. results in a third party purchase or sale of an affected stock.

In short, in subdivisions (a), (b), and (d) of section 25400 the Legislature made acts of market manipulation in California a felony. It did not make them so only if the defendant intended to affect only the market for stocks in California or only if California stock transactions resulted. Assuming, arguendo, that a stock transaction in California is an element of a violation of subdivisions (c) and (e) of section 25400, as the Legislature has provided that it is unlawful "in this state" to induce a purchase or sale by means of tips about potential market operations, there would still be liability to buyers in other states.

Subdivisions (c) and (e) of section 25400 make it unlawful "to induce the purchase or sale" of a stock by circulating tipster sheets. Section 25008 provides, inter alia, that a sale of a security is made in California when the offer to sell is made "in this state" or an offer to buy is accepted in California. (§ 25008, subd. (a).) An offer to sell is made "in this state" if the offer originates from California. (§ 25008, subd. (b).) Thus, a sale occurs "in this state" even if the purchaser is in, and communicates acceptance of the

offer to sell from, New York. Thus, while aftermarket out-of-state purchases and sales might not qualify as purchases and sales induced "in this state," a California corporation which offered its shares for sale on a nationwide basis would be liable to out-of-state purchasers who accepted the offer. This follows because under section 25008, a sale occurs in California if the offer emanates from this state. The purchaser, who has a right to sue under section 25500, may be in another state. Petitioners' argument that section 25400 does not apply to interstate transactions thus fails.

As noted above, resort to section 25008, which defines "in this state" for the purpose of determining when a stock transaction takes place in California, does not aid Diamond Multimedia's argument. ■ To the extent that section 25400 prohibits stock transactions for market manipulation purposes in subdivisions (a) and (b), section 25008 applies to establish whether that conduct occurred in California. The definition of "in this state" is not restrictive, however, and does not operate to confine liability for violation of section 25400 to intrastate transactions. This is apparent when the section 25008 definitions are applied to violations of subdivisions (c) and (e) of section 25400.

These section 25008 definitions, which clearly encompass interstate transactions, necessarily extend liability for stock transactions induced by conduct made unlawful by subdivisions (c) and (e) of section 25400 beyond those which occur wholly within California. Under defendants' reading of section 25400, however, it would be unlawful to engage in that type of manipulative conduct only if the purchaser was in California, and the section 25500 remedy would be available only if the stock was purchased by a person in California. That reading of section 25400 would render the section 25008 definition of sale "in this state" superfluous, as it would deny a remedy to the purchaser even if the offer to sell had been made in this state.

Inasmuch as section 25008 does apply in determining when "in this state" a defendant "induce[s] a sale of stock" by circulation of a tipster sheet, a violation may occur when the stock is purchased by a person in New York and the person in New York has a remedy under section 25500. There is no reason to believe that the Legislature intended to deny to an out-of-state purchaser a remedy for market manipulation in violation of subdivision (d) of section 25400 that it has provided to the same purchaser for violation of subdivisions (c) and (e) of that statute.

Nor is it surprising that in section 25008 the Legislature did not define when a false or misleading statement is made "in this state" for purposes of subdivision (d) of section 25400. Subdivision (d) does not prohibit stock transactions and thus the definitions of section 25008 are not implicated.

Section 25400, subdivision (d) prohibits false or misleading statements or omissions when made for the purpose of manipulating the market for a stock. There is no need to provide a definition for "in this state" in that context. Unlike a stock transaction, in which the buyer and seller or offeree and offeror may be in different states, there is no difficulty in determining if the unlawful statement or omission in violation of subdivision (d) of section 25400 is made in this state and justifies assertion of jurisdiction over the violator. If the statement is made by a person in California or is willfully disseminated in California, it is made "in this state." Thus, while we recognize that the Legislature did not provide an alternative definition of "in this state" for subdivision (d) of section 25400, there was no need for it to do so.

The introductory clause of section 25400 prohibits commission of manipulative acts in California.[14] It does not say in subdivision (d) that it is (1) unlawful in California to engage in market manipulation (2) with the intent to induce a purchase or sale of stock in California (3) if a purchase or sale of the stock in California is affected by the manipulative conduct.

This court is not free to insert as elements of a section 25400 violation a requirement that the defendant intend to induce a sale in California or, insofar as subdivisions (a), (b), and (d) are concerned, that there actually be an affected third party transaction in stock, nor is it free to impose limits on civil liability that do not exist for criminal liability under the same statute.

Section 25400 says and implies nothing about the person or persons who may enforce section 25400 or obtain relief for violation of section 25400. That subject is covered in section 25500 et seq. Insofar as this action is concerned, section 25500 applies, creating civil liability for the violation of section 25400 and making relief available to "any person." Section 25500 provides: "Any person who willfully participates in any act or transaction in violation of Section 25400 shall be liable to *any other person* who purchases or sells any security at a price which was affected by such act or transaction for the damages sustained by the latter as a result of such act or transaction. . . ." (Italics added.)

Section 25500 does not limit a violator's liability to persons who purchase or sell stock in California. "Any" person affected by acts of market manipulation which take place in California may recover damages from the violator.

---

[14]Transposition of "in this state" to each of the subdivisions of section 25400 would create additional anomalies that would be inconsistent with the purpose of the prohibition of market manipulation. A person attempting to affect the market in a stock to induce a purchase or sale in California could simply enter buy or sell orders, or engage in the sale and/or purchase of the stock outside California and thereby escape liability under subdivisions (a), (b), and (c) of section 25400.

Moreover, section 25500 is not the only provision of the law creating civil liability for violation of section 25400. In subdivision (b) of section 25530, the Corporate Securities Law of 1968 expressly permits the Commissioner of Corporations to seek relief on behalf of investors, and, like section 25500, section 25530, subdivision (b) contains no language limiting "investors" to California investors. It provides: "If the commissioner. determines it is in the public interest, the commissioner may include in any action authorized by subdivision (a) [for injunctive relief] a claim for ancillary relief, including but not limited to, a claim for restitution or disgorgement or damages *on behalf of the persons injured* by the act or practice constituting the subject matter of the action, and the court shall have jurisdiction to award additional relief." (*Ibid.,* italics added.)

Comparison of section 25400 with other parts of the Corporate Securities Law leads to the same conclusion. When the Legislature intended that a purchase or sale of a stock must occur in California if the buyer or seller is to be subject to civil, criminal, or administrative penalties, it said so without the necessity of transposing the "in this state" proviso as Diamond Multimedia suggests we do in section 25400. Thus, section 25402 provides that it is unlawful for an issuer or insider "to purchase or sell any security of the issuer *in this state* at a time when he knows material information about the issuer gained from such relationship which would significantly affect the market price of that security and which is not generally available to the public . . . ." (Italics added.) There the Legislature did not, as it did in section 25400, provide that "it is unlawful . . . in this state" to use insider information in the purchase or sale of stock. Similarly, in section 25401 the Legislature expressly limited the scope of the prohibition of false or misleading statements in an offer to buy or sell. That section makes it "unlawful for any person to offer or sell a security *in this state* or buy or offer to buy a security *in this state* by means of any written or oral communication which includes an untrue statement . . . ." (*Ibid.,* italics added.) In sections 25110 and 25130, the Legislature again made it unlawful to offer or sell an unqualified security "in this state." In short, the various provisions of the Corporate Securities Law are quite specific in describing those unlawful practices in which a purchase or sale must occur in California.[15] In those sections, the Corporate Securities Law regulates securities transactions in California. Section 25400, by contrast, does not regulate third party securities transactions. Its focus is the prevention of manipulation of the market price of securities. The only transactions section 25400 regulates are manipulative transactions in California. The price of most stock is established

---

[15]Even there, however, by virtue of section 25008, interstate transactions may be made "in this state."

on a national market. For that reason section 25400 is not concerned with whether the third party sale or purchase of a stock affected by such manipulation takes place in California and does not limit the right to recover for damage caused by market manipulation to persons who buy or sell stock in California.

As plaintiffs note, had the drafters and the Legislature intended to restrict in every case the civil liability of persons who engage in practices made unlawful by section 25400, they could easily have done so in section 25500 by inserting the "in this state" limitation in that section. It would then have read: "Any person who willfully participates in any act or transaction in violation of Section 25400 shall be liable to any other person who purchases or sells any security *in this state* at a price which was affected by such action or transaction . . . ." ■ The drafters and the Legislature did not do so, however, and it is not our function to insert language omitted by the Legislature. (*Manufacturers Life Ins. Co.* v. *Superior Court* (1995) 10 Cal.4th 257, 274 [41 Cal.Rptr.2d 220, 895 P.2d 56].)

A conclusion that the Corporate Securities Law is directed only to intrastate transactions would be inconsistent with section 25008, which establishes the criteria by which to determine if offers to sell, sales, offers to purchase, and purchases are made in California. Section 25008 clearly contemplates interstate transactions. Under section 25008, "(a) [a]n offer or sale of a security is made in this state when an offer to sell is made in this state, or an offer to buy is accepted in this state . . . . [¶] (b) [a]n offer to sell or buy is made in this state when the offer either originates from this state or is directed by the offeror to this state and received at the place to which it is directed. An offer to buy or to sell is accepted in this state when acceptance is communicated to the offeror in this state; and acceptance is communicated to the offeror in this state when the offeree directs it to the offeror in this state . . . ." These definitions bring interstate transactions within the scope of California regulation, and section 25500 provides for service of process on out-of-state defendants.

Defendants argue nonetheless that this court should consider the legislative purpose in enacting the Corporate Securities Law—that of regulating securities in the intrastate market not reached by federal securities regulation. We have no doubt that this was the intent of the drafters of the Corporate Securities Law and, presumably, the Legislature. It does not follow, however, that the civil remedies created by section 25500 are available only to persons who bought or sold securities in California. It is apparent that extending those remedies to any person affected by the proscribed forms of manipulative conduct has a far greater deterrent impact than limiting a defendant's exposure to civil liability for in-state transactions

would have done. Thus we have no reason to infer that the omission in section 25500 of any territorial limitation was inadvertent or that the Legislature anticipated that, by proscribing manipulative conduct occurring only "in this state" in section 25400, the Legislature anticipated that section 25500 would be construed as permitting civil recovery only if a purchase or sale of stock affected by the proscribed conduct occurred "in this state." The language of sections 25400 and 25500 does not lend itself to the construction urged by defendants.

Defendants ask that we consider not only the context in which the Corporate Securities Law was enacted, but also available legislative history in the form of comments made by the committee appointed by then Commissioner of Corporations Harold R. Volk, which drafted the law when the law was submitted to the Legislature, and by Commissioner Volk and Professor Harold Marsh, Jr., the reporter of that committee, in their treatise, Practice Under the California Corporate Securities Law of 1968 (1969). We decline the invitation. ■ Only when the language of a statute is susceptible to more than one reasonable construction is it appropriate to turn to extrinsic aids, including the legislative history of the measure, to ascertain its meaning. (*Granberry* v. *Islay Investments* (1995) 9 Cal.4th 738, 744 [38 Cal.Rptr.2d 650, 889 P.2d 970].)

We note, however, the materials cited by defendants are not inconsistent with our conclusion that the civil remedies of section 25500 are not limited in the manner suggested by Diamond Multimedia. The drafters' comments confirm that the purpose of the Corporate Securities Law is to give greater protection to California residents than that available under the prior law or federal law, but they do not suggest that the law was not intended to protect all persons affected by market manipulation that occurs in California.

The drafting committee was appointed by Commissioner of Corporations Volk to review the then applicable 1917 Corporate Securities Law to determine if it gave sufficient protection to investors, was unduly burdensome on legitimate businessmen, and consider if the 1917 law was generally adequate to the regulatory problems in the 1967 securities market. (Volk, Preface to Proposed Corporate Securities Law of 1968 (Oct. 20, 1967); Drafting Com., Introduction to Proposed Corporate Securities Law of 1968 (hereafter Drafting Committee Report).) Diamond Multimedia relies on the final sentence of a paragraph of the introduction to support its argument that the intent of the drafters was to regulate only intrastate stock transactions: "There has long been a need in California to clearly define what acts constitute a violation of our securities law. The fraudulent and prohibited practices enumerated in Part 5 are modeled upon existing Federal laws, both statutory and common law, which are applicable to all interstate securities transactions. The latter

constitute by far the bulk of the securities market in California. The effort here is to more clearly define the acts which are malum prohibitum *and to apply the prohibitions to the intrastate securities market* which is the greater state regulatory problem when compared to the interstate market." (Drafting Com. Rep., *supra*, at p. iii, italics added.)

This statement is not inconsistent with a conclusion that the civil remedies of section 25500 are available to both in-state and out-of-state purchasers and sellers affected by market manipulation occurring in California. Section 25400 defines those practices which are prohibited in California. Extending civil remedies for violating those provisions to all affected purchases is fully consistent with a purpose of applying the prohibitions themselves to intra-state conduct.

When describing section 25400 specifically, Marsh and Volk note that unlike liability under sections 25401 and 25501, under which a violator is liable only to persons with whom he or she deals, under section 25500 "the defendant may be *liable to any person* trading in the market for any length of time that the market price may have been affected by his misstatement. In view of this potentially enormous and virtually unlimited liability, the intent of the defendant to affect the market by inducing the purchase or sale of the security by others was a necessary qualification of the defendant's liability." (1 Marsh & Volk, Practice Under the Cal. Securities Laws (1998) § 14.05[2][e], p. 14-50, italics added (Marsh & Volk).) In the same discussion the authors explain why the plaintiff must establish fault as an element of a cause of action under subdivision (d) of section 25400. "[I]t is not an unreasonable requirement for holding a defendant *liable for everyone's trading losses* in the market for an indefinite period of time to insist that the plaintiff prove that the defendant did something wrong." (Marsh & Volk, *supra*, § 14.05[2][e], p. 14-50, italics added.) This explanation of the draft-ers' intent is inconsistent with a conclusion that a section 25400 violator must intend to induce a purchase or sale "in this state." And in their paragraph on "Persons Entitled to Recover," the authors note that, while sections 25501 and 25502 under which privity of contract between the defendant and plaintiff, under section 25500 the defendant who violates section 25400 is liable to "any other person" whose trade is affected by the unlawful conduct of the defendant. (Marsh & Volk, *supra*, § 14.05[5], p. 14-53.) Again there is no suggestion that only persons who bought or sold stock in California may seek relief under section 25500 for a section 25400 violation.[16]

 The contention that state exercise of jurisdiction over interstate transactions would somehow be inconsistent with federal law and thus

---

[16]Walter G. Olson, vice-chairman of the drafting committee, wrote shortly after the Corporate Securities Law become effective: "[L]iability for violation of [section 25400] *flows*

violate the supremacy clause (U.S. Const., art. VI, cl. 2) also lacks merit. ■ The Securities Exchange Act of 1934 (15 U.S.C. § 78bb(a)) makes it clear that, except to the extent it has been subsequently modified by the Securities Litigation Uniform Standards Act of 1998, federal law in this arena supplements, but does not displace state regulation and remedies. "Congress plainly contemplated the possibility of dual litigation in state and federal courts relating to securities transactions. See 15 U.S.C. § 78bb(a) (preserving 'all other rights and remedies that may exist at law or in equity')." (*Matsushita Elec. Industrial Co.* v. *Epstein, supra,* 516 U.S. at p. 383 [116 S.Ct. at p. 882]; see also *SEC* v. *National Securities, Inc.* (1969) 393 U.S. 453, 461 [89 S.Ct. 564, 569, 21 L.Ed.2d 668]; *Johnson-Bowles* v. *Division of Securities* (Utah Ct.App. 1992) 829 P.2d 101, cert. den. 843 P.2d 516; *E. F. Hutton & Co., Inc.* v. *Rousseff* (Fla. 1989) 537 So.2d 978.)[17]

■ Neither Diamond Multimedia nor Justice Brown has identified any direct or indirect conflict between sections 25400/25500 and any provision of the federal securities laws applicable to this litigation. As noted above (see fn. 12, *ante*), the Securities Litigation Uniform Standards Act of 1998 has no impact on this case. And, contrary to defendants' suggestion that the complaint in this action seeks to impose liability on the basis of forward-looking statements that are protected by federal law under 15 United States Code section 78u-5, plaintiffs allege, inter alia, that petitioners are liable for market manipulation on the basis of false and misleading statements and omissions, which statements, under section 25500, were made "willfully." Subdivision (c) of 15 United States Code section 78u-5, the "Safe Harbor" provision, immunizes forward-looking statements only "in any private action

---

to any and all persons who purchase or sell a security at a price affected by the act or transaction . . . . [T]he potential plaintiffs include everyone who buys or sells the securities affected." (Olson, *The California Corporate Securities Law of 1968* (1968) 9 Santa Clara L.Rev. 75, 98, fn. omitted.)

[17] 15 United States Code section 78bb(a): "The rights and remedies provided by this chapter shall be in addition to any and all other rights and remedies that may exist at law or in equity; but no person permitted to maintain a suit for damages under the provisions of this chapter shall recover, through satisfaction of judgment in one or more actions, a total amount in excess of his actual damages on account of the act complained of. Except as otherwise specifically provided in this chapter, nothing in this chapter shall affect the jurisdiction of the securities commission (or any agency or officer performing like functions) of any State over any security or any person insofar as it does not conflict with the provisions of this chapter or the rules and regulations thereunder. No State law which prohibits or regulates the making or promoting of wagering or gaming contracts, or the operation of 'bucket shops' or other similar or related activities, shall invalidate any put, call, straddle, option, privilege, or other security, or apply to any activity which is incidental or related to the offer, purchase, sale, exercise, settlement, or closeout of any such instrument, if such instrument is traded pursuant to rules and regulations of a self-regulatory organization that are filed with the Commission pursuant to section 78s(b) of this title."

arising under this chapter" (*id.,* § 78u-5(c)(1)), i.e., under the Securities and Exchange Act of 1934. Moreover, assuming, as does Justice Brown, that Congress intended a wider application of the Safe Harbor provision, the immunity it creates does not insulate forward-looking statements that omit information about factors that may cause actual results to differ materially and/or are made with actual knowledge that the statement is false and misleading.[18] The complaint alleges falsity, omission of such factors, and actual knowledge. ▇ While the allegation of actual knowledge may not extend to all of the allegedly false and misleading statements, a complaint is sufficient and must be upheld if it states a cause of action on any theory. (*American Airlines, Inc.* v. *County of San Mateo* (1996) 12 Cal.4th 1110, 1118 [51 Cal.Rptr.2d 251, 912 P.2d 1198]; *Alliance Mortgage Co.* v. *Rothwell* (1995) 10 Cal.4th 1226, 1232 [44 Cal.Rptr.2d 352, 900 P.2d 601].) For that reason, defendants' demurrer was properly overruled.

If plaintiffs establish at trial that defendants knew their statements were false and misleading, imposition of civil liability for violation of subdivision (d) of section 25400 will not conflict with federal law.

Amicus curiae Adobe Systems Incorporated (Adobe) suggests that the proper focus for construing sections 25400/25500 is on the latter section.[19] It argues that the "in this state" language of section 25400 need not be considered. Instead, we should apply a presumption against extraterritoriality

---

[18] 15 United States Code section 78u-5 provides in pertinent part:

"(c) Safe Harbor

"(1) In general

"Except as provided in subsection (b) of this section, in any private action arising under this chapter that is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading, a person referred to in subsection (a) of this section shall not be liable with respect to any forward-looking statement whether written or oral, if and to the extent that—

"(A) the forward-looking statement is—

"(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual result to differ materially from those in the forward-looking statement; or

"(ii) immaterial; or

"(B) the plaintiff fails to prove that the forward-looking statement—

"(i) if made by a natural person was made with actual knowledge by that person that the statement was false or misleading; or

"(ii) if made by a business entity; was—

"(I) made by or with the approval of an executive officer of that entity; and

"(II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading."

[19] Adobe asks that the court take judicial notice of the reply brief filed by plaintiffs' present counsel in *Mirkin* v. *Wasserman, supra,* 5 Cal.3d 1082, in which counsel stated that the Corporations Code does not address the remedies available to open market purchasers who claim fraud. While judicial notice is permissible under Evidence Code sections 452 and 459,

in remedial statutes. Adobe relies on our application of that presumption in *North Alaska Salmon Co.* v. *Pillsbury* (1916) 174 Cal. 1 [162 P. 93], a decision construing the then applicable workers' compensation law. A worker who entered into a contract with a California corporation for employment as a fisherman was injured in Alaska. The Industrial Accident Commission awarded compensation. On the employer's appeal this court annulled the award, holding that the right to compensation was controlled by the applicable statutes, not the contract, and the statute did not give the commission jurisdiction to award compensation for out-of-state injuries.

The court also stated: "Although a state may have the power to legislate concerning the rights and obligations of its citizens with regard to transactions occurring beyond its boundaries, the presumption is that it did not intend to give its statutes any extraterritorial effect. The intention to make the act operative, with respect to occurrences outside the state, will not be declared to exist unless such intention is clearly expressed or reasonably to be inferred 'from the language of the act or from its purpose, subject matter or history.' " (*North Alaska Salmon Co.* v. *Pillsbury, supra*, 174 Cal. at p. 4.) We found nothing in the Workmen's Compensation, Insurance and Safety Act to indicate that the compensation provisions of that law were intended to apply to injuries suffered in other jurisdictions, and also noted that there was strong authority that workers' compensation statutes are not to be given extraterritorial effect absent an express declaration that do so. On that basis we held that the commission had exceeded its jurisdiction. (*Id.* at p. 7.)

As discussed above, however, unlike the injury in *North Alaska Salmon Co.* v. *Pillsbury, supra*, 174 Cal. 1, the conduct which gives rise to liability under section 25400 occurs in California.

The presumption applied in *North Alaska Salmon* to a workers' compensation statute has never been applied to an injured person's right to recover damages suffered as a result of an unlawful act or omission committed in California.[20] Civil Code section 3281 provides that "[e]very person who suffers detriment" from unlawful acts or omissions in California may recover damages from the person at fault. Product liability actions against

---

we deny the request. What counsel argued in another case is irrelevant to the proper construction of sections 25400/25500.

[20]Adobe identifies *EEOC* v. *Arabian American Oil Co.* (1991) 499 U.S. 244 [111 S.Ct. 1227, 113 L.Ed.2d 274], as an application of the presumption against extraterritoriality on which it relies. There, however, as in *North Alaska Salmon Co.* v. *Pillsbury, supra*, 174 Cal. 1, the wrongful act as well as the injury occurred in the foreign jurisdiction. As the high court explained in *EEOC* v. *Arabian American Oil Co., supra*, 499 U.S. at page 248 [111 S.Ct. at pages 1230-1231], the presumption against extraterritoriality serves to prevent clashes between the laws of the United States and other nations. Sections 25400 and 25500 provide a

California manufacturers by persons injured elsewhere by a defective product manufactured in California are a prime example of actions authorized by Civil Code section 3281. (See, e.g., *Stangvik* v. *Shiley Inc.* (1991) 54 Cal.3d 744 [1 Cal.Rptr.2d 556, 819 P.2d 14]; *Shiley Inc.* v. *Superior Court* (1992) 4 Cal.App.4th 126 [6 Cal.Rptr.2d 38]; *Holmes* v. *Syntex Laboratories, Inc.* (1984) 156 Cal.App.3d 372 [202 Cal.Rptr. 773].) We see no reason to conclude that the Legislature intended a different result for actions based on violation of section 25400.

Diamond Multimedia argues that four federal decisions support its construction of sections 25400 and 25500. They do not. The first of those cases, *In re Victor Technologies Securities Litigation* (N.D.Cal. 1984) 102 F.R.D. 53 (*Victor Technologies*), actually supports plaintiffs. The decision does not address section 25400 in disposing of a motion for class certification. The opinion states only that state law claims, alleging false and misleading statements in a registration statement and prospectus filed with the Securities and Exchange Commission, were brought under sections 25500 and 25502. After addressing the requirements for class certification of rule 23(a) and (b) of the Federal Rules of Civil Procedure (28 U.S.C.), the court considered the defendants' argument that class certification for the state law claim should be denied on the ground that only persons who purchased stock in California could maintain a cause of action.

The district court rejected the argument, holding: "The jurisdictional prerequisites of a claim filed under section 25500 are satisfied when offers of securities are made from California to persons outside the state, or when acceptance of the offer is directed to a person within California. See Cal. Corp. Code § 25008(b). *See generally* Marsh & Volk, *Practice under the*

---

remedy for a wrongful act committed in California. There is no potential in this for a "clash" between California law and that of any other state or of the United States.

The presumption against extraterritoriality is one against an intent to .encompass *conduct* occurring in a foreign jurisdiction in the prohibitions and remedies of a domestic statute. (See, e.g., *Smith* v. *United States* (1993) 507 U.S. 197, 203-204 [113 S.Ct. 1178, 1182-1183, 122 L.Ed.2d 548] [presumption against extraterritorial application of United States law requires that doubts as to the reach of the Federal Tort Claims Act be resolved against its encompassing torts committed in Antarctica]; see also 73 Am.Jur.2d (2d ed. 1974) Statutes, § 359, p. 492 [absent clearly expressed contrary intent the presumption is that statute is intended to have no extraterritorial effect, but to apply only in jurisdiction of state or country enacting it]; *Tattis* v. *Karthans* (Miss. 1968) 215 So.2d 685 [words spoken in North Carolina not actionable under Mississippi state statute]; *Marmon* v. *Mustang Aviation, Inc.* (Tex. 1968) 430 S.W.2d 182 [Texas wrongful death statute does not provide remedy for death occurring in Colorado accident]; *Burns* v. *Rozen* (Fla.Dist.Ct.App. 1967) 201 So.2d 629 [Florida statute regulating method of taking fish applied only to territorial waters of state]; *Dur-ite Co.* v. *Industrial Commission* (1946) 394 Ill. 338 [68 N.E.2d 717] [workers' compensation law does not encompass persons employed outside State of Illinois].)

*California Securities Laws*, § 3.08[1] (1983). [¶] As the offering materials in this action apparently emanated from Victor's California headquarters, and the buyers' acceptances were apparently directed at a California entity, it is appropriate to certify a plaintiff class for this claim. It should be emphasized, however, that the class certification for the claims filed under the California Corporations Code includes only those purchasers of Victor stock who purchased in direct response to the initial March 23 public offering. Those who purchased Victor stock on the open market at some point after the initial public offering will not be part of the sub-class entitled to proceed under sections 25500 and 25501 of the California Corporations Code. (Of course, if those who purchased later were California purchasers, they will be entitled to maintain a claim under the California Code.)" (102 F.R.D. at p. 60.)

*Victor Technologies* thus affirms that out-of-state purchasers may state a claim under section 25500. While it also holds that aftermarket purchasers may not do so unless they purchased their shares in California, there is no mention of section 25400, no consideration of the language of that section, and neither analysis or explanation of the conclusion. On that point the decision is not persuasive authority.

*Victor Technologies* was followed by *Weinberger* v. *Jackson* (N.D.Cal. 1984) 102 F.R.D. 839. Again the decision disposed of a motion for class certification. Without discussion, the district court followed *Victor Technologies*, and certified a nationwide class action which sought relief under federal law and sections 25400 and 25500, but excluded aftermarket purchasers who did not purchase their stock in California. Again, there was no discussion or analysis of section 25400. The district court said only "Aftermarket purchasers not purchasing in California are not part of the class as to the California Corporations Code claims. *See also In re Victor Technologies Securities Litigation*, 102 F.R.D. 53, 60 (N.D. Cal. 1984)." (102 F.R.D. at p. 847.)

In *In re Activision Securities Litigation* (N.D.Cal. 1985) 621 F.Supp. 415, claims were brought under federal law and sections 25400/25500, 25401/ 25501, and 25504/25504.1 for sale of securities by means of an allegedly misleading registration statement and prospectus. The district court, again without discussion or analysis, excluded non-California aftermarket purchases from the class. It said only: "[M]embers of the plaintiff class who purchased Activision stock over-the-counter after the public offering should not be included in the class for claims filed under the California Corporations Code unless they purchased the stock in California. *Victor Technologies*, 102 F.R.D. at 60; *Weinberger v. Jackson*, [102 F.R.D. 839]." (621 F.Supp. at p. 432.) The court failed to notice the distinction between section

25400, which contains no such requirement, and sections 25401 and 25504, pursuant to which a purchase or sale by means of misleading communications must be "in this state."

*Scholes* v. *Tomlinson* (N.D.Ill. 1992) 145 F.R.D. 485, made the same mistake. The Illinois class representative alleged violations of sections 25110, 25400, subdivision (d), and 25401. Quoting *McFarland* v. *Memorex* (N.D.Cal. 1982) 96 F.R.D. 357, the court stated: " 'Only purchasers who can show the requisite contacts with California can satisfy the jurisdictional limitations of Cal. Corp.Code, Section 25008.' *McFarland* v. *Memorex Corp.*, 96 F.R.D. 357, 364. (N.D.Cal.1982). 'These sections apply only to purchasers who buy a security in California . . .'. *McFarland*, 96 F.R.D. at 364." (145 F.R.D. at p. 493.) In *McFarland* v. *Memorex, supra*, 96 F.R.D. 357, the action was brought under sections 25401/25501, however. There was no section 25400/25500 claim.

Thus, while the federal decisions which have considered nationwide class actions under section 25400 have erroneously excluded aftermarket purchasers, they do recognize the right of out-of-state purchasers to seek relief under that section. They do not support defendants' contention that no out-of-state purchasers may bring a section 25400 action.

Diamond Multimedia has cited, and we have found, no decisions in the courts of our sister states in which actions on behalf of a nationwide class or out-of-state purchasers of securities brought under state securities laws have been dismissed because plaintiffs did not purchase the securities in the state. An interstate class action by an out-of-state purchaser of bonds was permitted in *Rosenthal* v. *Dean Witter Reynolds, Inc.* (Colo.Ct.App. 1994) 883 P. 2d 522. There the plaintiffs alleged, inter alia, fraudulent conduct in connection with the offer and sale of a security in violation of the Colorado Securities Act (Colo. Rev. Stat. § 11-51-123(3) (1987)). There the court upheld the right of a Pennsylvania purchaser of bonds issued and offered for sale in Colorado to represent a nationwide class of purchasers, rejecting a claim that the entire transaction had to occur in Colorado. In so doing the Colorado court noted that *Simms Inv. Co.* v. *E.F. Hutton & Co.* (M.D.N.C. 1988) 699 F.Supp. 543 held that the Colorado securities law and the North Carolina common law of fraud could apply to a claim that defendants had made misrepresentations and omissions to induce the plaintiff to participate in a joint venture. The court read *Simms* as holding that, and agreed that Colorado law applied if either the offer or the sale took place in Colorado. Quoting *Simms*, the Colorado court observed: "Blue Sky laws 'protect legitimate resident issuers by exposing illegitimate resident issuers to liability, without regard to the markets of the issuer.' *Simms Investment Co.* v. *E.F.*

*Hutton & Co.*, 699 F.Supp. at 545." (*Rosenthal* v. *Dean Witter Reynolds, Inc.*, *supra*, 883 P.2d at p. 531.) On certiorari, the Colorado Supreme Court affirmed the judgment of the court of appeals, holding that class certification was proper. Colorado law applied as the misleading statements in the offer to sell were made in Colorado. It was irrelevant that the purchase was made through a broker in Pennsylvania. (*Rosenthal* v. *Dean Witter Reynolds, Inc.* (Colo. 1995) 908 P.2d 1095, 1104.)

■ Finally, we reject the claim that permitting out-of-state investors to recover damages under section 25500 would impose an impermissible burden on interstate commerce. Amici curiae Securities Industry Association, et al., argue that if section 25400 is construed as regulating out-of-state or interstate transactions in securities, the law may violate the commerce clause (U.S. Const., art. I, § 8). That argument fails to recognize that section 25400 regulates only manipulative conduct in California. It does not purport to regulate any "transactions" in securities which occur outside of this state (cf. *Healy* v. *The Beer Institute* (1989) 491 U.S. 324 [109 S.Ct. 2491, 105 L.Ed.2d 275]; *Edgar* v. *MITE Corp.* (1982) 457 U.S. 624 [102 S.Ct. 2629, 73 L.Ed.2d 269]) and does not discriminate against interstate commerce.

Amici curiae fail to explain how permitting persons who purchase or sell stock at a time when the market price is affected by market manipulation occurring in California to recover damages from the California malefactor burdens interstate commerce. Indeed, such recovery is allowed under federal securities law and we are unable to see how permitting recovery under section 25500 for violation of section 25400 imposes any burden on interstate commerce. Quite the opposite. By affording a remedy to persons who are the victims of manipulative conduct, section 25500 stimulates commerce in corporate stock.

Even were there some indirect burden on interstate commerce, that burden would not be constitutionally impermissible. While petitioners and several amici curiae argue that California has no legitimate interest in protecting out-of-state investors, it has a clear and substantial interest in preventing fraudulent practices in this state which may have an effect both in California and throughout the country. That is the purpose of section 25400. While substantial criminal penalties are available, the Legislature might reasonably conclude that imposing civil liability for all trading losses occasioned by proscribed manipulative conduct will be a substantial deterrent to violation. Even assuming arguendo that California had no interest in protecting investors in other states, the Legislature may reasonably conclude that California does have a legitimate interest in discouraging unlawful conduct that has a potential to harm California investors as well as persons in other states. (See

also *Hurtado* v. *Superior Court* (1974) 11 Cal.3d 574, 583 [114 Cal.Rptr. 106, 522 P.2d 666] [Purpose of wrongful death statute creating remedy for nonresidents as well as residents is to deter conduct that wrongfully takes life in this state.].) Extending the civil liability remedy to all investors serves that purpose.

It is true a state may not claim that its interest in protecting nonresident shareholders offsets a burden the state law imposes on interstate commerce. (See *Edgar* v. *MITE Corp., supra*, 457 U.S. at p. 644 [102 S.Ct. at pp. 2641-2642].) As noted earlier, however, section 25400 does not regulate stock transactions in other states and section 25500 does not penalize or discourage such transactions. Section 25400 may discourage fraudulent inducement of those transactions, but any indirect burden that places on out-of-state sales is clearly offset by the state interest in preventing fraud and protecting the integrity of the capital market for all investors.

California also has a legitimate and compelling interest in preserving a business climate free of fraud and deceptive practices. California business depends on a national investment market to support our industry. The California remedy for market manipulation helps to ensure that the flow of out-of-state capital necessary to the growth of California business will continue.[21] The Court of Appeal rejected a claim similar to that of petitioners and recognized the importance of extending state-created remedies to out-of-state parties harmed by wrongful conduct occurring in California in *Clothesrigger, Inc.* v. *G.T.E. Corp.* (1987) 191 Cal.App.3d 605 [236 Cal.Rptr. 605]. There the plaintiff sought damages for fraud, negligent misrepresentation and unfair business practices in the charges made by defendant for long distance telephone calls. The trial court denied certification of a nationwide class on the ground that a nationwide class was not suitable as California had no interest in providing greater protection to residents of other states than that provided by their home states. The Court of Appeal reversed that order, noting that defendant had identified no interest of any other state that might

---

[21]This point is emphasized by amici curiae the International Brotherhood of Teamsters and the Service Employees International Union, which note that Taft-Hartley pension plans, public pension plans, and company-sponsored stock investment plans have collectively invested over $500 billion in securities. They assert that protection of this nationwide group of investors is effective only if the Corporate Securities Law provides remedies to investors both within and outside California. Amicus curiae National Council of Senior Citizens states that the investment of public and private pensions had reached $1.3 trillion by 1992. They note that even California residents would suffer losses from market manipulation for which they would have no remedy under section 25500 if their pension plan made its investments in other states. This concern is echoed by two such pension plans, amici curiae Missouri State Employees' Retirement System and Pennsylvania State Employees' Retirement System, which state that they regularly invest substantial sums in securities of California corporations.

be affected by extending California's law to the injured nonresidents, and recognizing that "California may have an important interest in applying its law to punish and deter the alleged wrongful conduct." (*Id.* at p. 615.)

We conclude for all of these reasons that out-of-state purchasers and sellers of securities whose price has been affected by the unlawful market manipulation proscribed by section 25400 may avail themselves of the remedy afforded by section 25500. The remedy is not limited to transactions made in California. The trial court properly overruled petitioners' demurrer.

## IV

### Disposition

The order of the Court of Appeal summarily denying the petition for writ of mandate is affirmed.

George, C. J., Mosk, J., and Kennard, J., and Werdegar, J., concurred.

**BROWN, J.,** Dissenting.—

## I

Plaintiffs contend that both the language and legislative history of California's Corporate Securities Law of 1968 (Corp. Code, § 25000 et seq.)[1] demonstrate "a clear . . . intent" that the Act apply "to interstate as well as intrastate transactions." But that construction is belied by the text of the Act itself, by statements of its principal drafter, by commentators and securities litigation practice, and by court decisions. According to these interpretations, spanning more than 30 years, the Act was never intended to have an extraterritorial effect. Instead, it was drafted and enacted in the expectation that it would *supplement* the federal securities acts, statutes that apply to and regulate a truly nationwide securities market. That was the view of the Act and its role from the outset. In a letter dated April 19, 1968, to Senator Randolph Collier, a member of the California Senate Committee on Finance, Harold Marsh, Jr., a corporate law professor and the reporter for the committee of experts appointed to draft what became the Act, wrote that in drafting the legislation, the committee "tried to reach a balanced judgment as to how far it was possible for California to go in asserting jurisdiction over . . . predominately foreign transactions and, as a matter of policy, how far it *should* attempt to go." (Harold Marsh, Jr., Letter to Sen. Randolph Collier re Assem. Bill No. 1 (1968 Reg. Sess.) Apr. 19, 1968, p. 5.) The committee

---

[1]References to the Act are to the Corporate Securities Law of 1968.

sought "to give the greatest possible protection to California investors and at the same time to recognize that *California cannot rule the United States.*" (*Ibid.,* italics added.)

Professor Marsh's view of the Act's strictly intrastate application has been the almost unanimous consensus for more than a quarter-century. Because of the widely shared assumption that California's Blue Sky statute did not apply to out-of-state transactions, there simply was no litigation seeking to apply it extraterritorially. It was not until after Congress passed the Private Securities Litigation Reform Act of 1995, Public Law No. 104-67 (Dec. 22, 1995) 109 Statutes 737 (1995 U.S. Code Cong. & Admin. News, No. 1) (the Reform Act), legislation intended by its sponsors to put a stop to what the Senate report called "frivolous 'strike' suits alleging violations of the Federal securities laws in the hope that defendants will quickly settle to avoid the expense of litigation" (1995 U.S. Code Cong. & Admin. News, No. 2, at pp. 679, 683, reproducing Sen.Rep. No. 104-98 on Pub.L. No. 104-67 (June 19, 1995) (the Reform Act Report)) that serious, concerted efforts were mounted by the securities plaintiffs class action bar to widen the territorial scope of the California Blue Sky statute.

Before this litigation—founded on a revisionist history of the Act's purpose and scope—efforts were concentrated on enlarging the California statute by amendment. The ill-fated Proposition 211, rejected by California voters at the November 1996 election by a 3-to-1 margin, would have added Corporations Code section 25400.1 to the Act, containing almost identical language to existing section 25400, subdivision (d), but removing the limiting words "in this state." (See Ballot Pamp., Prop. 211: Text of Proposed Law, Gen. Elec. (Nov. 5, 1996) § 3, p. 95.) If, as the majority now assumes, existing Corporations Code section 25400 et seq. [2] has always authorized nationwide blue sky suits, why was the initiative provision needed? Of course, today's decision makes the defeat at the polls inconsequential. The court now magnanimously flings open the doors the voters emphatically closed. Indeed, the court insists on welcoming these actions despite Congress's repeated attempts to curtail them.

## II

On November 3, 1998, the President signed into law the Securities Litigation Uniform Standards Act of 1998 (Sen. No. 1260, 105th Cong., 2d Sess. (1998) (the Uniform Standards Act)). Among other effects, the Uniform Standards Act expressly preempts state blue sky laws, like California's

---

[2] All statutory references are to the Corporations Code unless otherwise stated.

Act, and "makes Federal court the exclusive venue for most securities class action lawsuits." (Joint Explanatory Statement of the Com. of Conf., Uniform Standards Act of 1998, 144 Cong. Rec. H10,774 (daily ed. Oct. 13, 1998).) The joint statement goes on to describe the Uniform Standards Act as intended "to prevent plaintiffs from seeking to evade the protections that Federal law provides against abusive [securities class action] litigation by filing suit in State, rather than in Federal, court" and to "protect the interests of shareholders and employees of public companies that are the target of meritless 'strike' suits." (*Ibid.*)

As the majority points out, the Uniform Standards Act does not apply retroactively. (See maj. opn., *ante*, at p. 1046, fn. 12.) That does not end the preemption inquiry, however. Given the several actual, irresolvable conflicts between the Reform Act and California's Blue Sky Law, the federal statute itself *impliedly* preempts the state law on which this suit rests. The reason is as well established as it is simple—California's Act, as the court now interprets it, " '[stands] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " (*Barnett Bank of Marion Cty., N.A.* v. *Nelson* (1996) 517 U.S. 25, 31 [116 S.Ct. 1103, 1108, 134 L.Ed.2d 237] (*Barnett Bank*), quoting *Hines* v. *Davidowitz* (1941) 312 U.S. 52, 67 [61 S.Ct. 399, 404, 85 L.Ed. 581]; see also *Freightliner Corp.* v. *Myrick* (1995) 514 U.S. 280, 287 [115 S.Ct. 1483, 1487, 131 L.Ed.2d 385] ["a federal statute implicitly overrides state law . . . when state law is in actual conflict with federal law"]; *Florida Avocado Growers* v. *Paul* (1963) 373 U.S. 132, 141 [83 S.Ct. 1210, 1216-1217, 10 L.Ed.2d 248].)

It is a bedrock proposition of supremacy clause jurisprudence that where federal and state laws are in "irreconcilable conflict," state law must give way. (*Rice* v. *Norman Williams Co.* (1982) 458 U.S. 654, 659 [102 S.Ct. 3294, 3298-3299, 73 L.Ed.2d 1042].) That much was established early on by Chief Justice Marshall's opinion in *Gibbons* v. *Ogden* (1824) 22 U.S. (9 Wheat.) 1, 210-211 [6 L.Ed. 23, 73] (The supremacy clause applies "to such acts of the state legislatures as . . . *interfere* with, or are contrary to, the laws of congress . . . . [I]n every such case, the act of congress . . . is supreme; and the law of the state . . . must yield to it." [Italics added.]). That is plainly the case here.

Recent decisions by several state appellate courts applying these established "implied conflict preemption" principles in analogous securities fraud class action cases strongly suggest (if they do not establish unequivocally) that this suit, too, is in "direct and irreconcilable conflict" with the federal Reform Act. It is thus preempted. In *Guice* v. *Charles Schwab & Co., Inc.*

(1996) 89 N.Y.2d 31 [651 N.Y.S.2d 352, 674 N.E.2d 282], certiorari denied 117 S.Ct. 1250 [137 L.Ed.2d 331] (*Guice*), retail securities customers of two nationwide discount stock brokerage firms sought national class action monetary and injunctive relief, claiming that the failure of defendant brokers to disclose the acceptance of "payments for order flow" from wholesale securities dealers for routing customer orders to them breached defendants' fiduciary obligation under New York's common law of agency of "full and frank disclosure" to plaintiffs. (89 N.Y.2d at p. 38 [674 N.E.2d at p. 285].)

Relying on *Barnett Bank, supra,* 517 U.S. 25 [116 S.Ct. 1103], the latest in a long line of Supreme Court implied preemption decisions, the New York Court of Appeals held the claims of the plaintiff class were preempted by the 1975 amendments to the Securities Exchange Act and the implementing Securities Exchange Commission (SEC) regulations. (*Guice, supra,* 89 N.Y.2d at p. 39 [674 N.E.2d at p. 285].) The amendments, the New York high court reasoned, "were intended to give the SEC the power administratively to develop a 'coherent and rational regulatory structure to correspond to and to police effectively the new national [securities] market system [citation].' " (*Id.* at pp. 45-46 [674 N.E.2d at p. 289].) If the courts of each of the 50 states were permitted "to impose civil liability on national securities brokerage firms . . . for failure to meet more stringent common-law agency standards of disclosure of receipt of order flow payments (rather than the Federally mandated *uniform* specific disclosure . . .)[,] the congressional purpose of enabling the SEC to develop and police [a] 'coherent regulatory structure' for a national market system" would be defeated. (*Id.* at p. 46 [674 N.E.2d at p. 289].)

The *Guice* decision does not stand alone. Fully a half-dozen opinions by appellate courts across the country have reached the identical conclusion. (See *Dahl* v. *Charles Schwab & Co., Inc.* (Minn. 1996) 545 N.W.2d 918, 925 (*Dahl*), cert. den. 519 U.S. 866 [117 S.Ct. 176, 136 L.Ed.2d 116] [reasoning that compliance with state laws might lead to an end to the practice of order flow payments, thus conflicting with federal law permitting it; state law preempted]; *Eirman* v. *Olde Discount Corp.* (Fla.Dist.Ct.App. 1997) 697 So.2d 865 [adopting rationale of *Guice* and *Dahl*]; *Orman* v. *Charles Schwab & Co., Inc.* (1997) 179 Ill.2d 282 [227 Ill.Dec. 927, 688 N.E.2d 620], cert. den. __ U.S. __ [118 S.Ct. 1518, 140 L.Ed.2d 670] [maintenance of state claims by plaintiff class would obstruct the national market system Congress intended to foster; state law preempted]; *McKey* v. *Charles Schwab & Co.* (1998) 67 Cal.App.4th 731 [79 Cal.Rptr.2d 213] (*McKey*) [collecting the cases nationally and adopting the rationale of *Guice* and *Dahl*].) To our knowledge, the only contrary authority consists of two federal district court decisions, one of which is unreported. (See *Gilman* v. *Wheat, First Securities,*

*Inc.* (D.Md. 1995) 896 F.Supp. 507; *Thomas* v. *Charles Schwab & Co., Inc.* (W.D.La., July 12, 1995, No. 95-0307) 1995 WL 626522; cf. *McKey, supra,* at pp. 740-741.)

Many of the factors that determined the result in the *Guice* and *Dahl* cases are present in this case. It is clear from the legislative history of the Reform Act (see Reform Act Report, *supra,* at pp. 683-703) that Congress was motivated by what the Senate report called "frivolous 'strike' suits alleging violations of the Federal securities laws in the hope that defendants will quickly settle to avoid the expense of litigation. These suits, which unnecessarily increase the cost of raising capital and chill corporate disclosure, are often based on nothing more than a company's announcement of bad news, not evidence of fraud." (*Id.* at p. 683.) Virtually the entire thrust of the Reform Act is directed at inhibiting such "strike" shareholder litigation, which typically takes the form of fraud-based class action suits brought under SEC rule 10(b)-5 (17 C.F.R. § 240.10b-5 (1998)).

The Reform Act adopts a number of measures intended by Congress to remove incentives to shareholder participation in what the Reform Act's managers called class action litigation "abuses." (Reform Act Report, *supra,* at p. 683.) These include a "safe harbor" or circumscribed immunity from liability provision for "forward-looking statements" or forecasts by issuers if prescribed conditions are met (Reform Act Report, *supra,* § 102(a)); a mandatory stay of discovery in federal court litigation while a motion to dismiss is pending; enhanced pleading standards that require fact-specific recitals of allegations supporting fraud claims; a "lead plaintiff" provision designed to put shareholders, rather than class counsel, in charge of securities class action litigation; and a system of proportionate, rather than joint and several, liability for defendants not shown to have committed fraud knowingly. (*Id.,* § 101(b).)

Consider only one of the several possible conflicts with the California securities statute these provisions might produce: If, on the one hand, the federal Reform Act *limits* the liability of securities issuers for "forward looking" forecasts when the conditions prescribed by the "safe harbor" requirements (15 U.S.C. § 78u-5 of the Securities Exchange Act of 1934) are present and, on the other hand, California's Blue Sky Law imposes an *unqualified* liability on securities issuers for such forecasts, the two provisions cannot be reconciled. Because it is impossible for those subject to the California statute and the Reform Act to comply with both, the state statute must give way.

Indeed, not a single provision of the Reform Act has a counterpart in California's Act. That fact probably accounts for the "migration," in the

wake of passage of the Reform Act, of securities fraud class action litigation from the federal courts, historically the overwhelmingly preferred venue, to the suddenly more hospitable state courts and state blue sky statutes. An analysis prepared by Stanford Law School's Securities Litigation Law Project found that although the aggregate number of securities fraud class action lawsuits remained relatively static following enactment of the Reform Act, that statistic masks an underlying and significant change—a sharp increase in securities fraud class action litigation brought under state blue sky laws, and a corresponding diminution in comparable federal court SEC-based litigation. (Grundfest & Perino, *Securities Litigation Reform: The First Year's Experience* (Feb. 27, 1997) <http://securities.stanford.edu/report/pslra_yr1/index.html> [visited Jan. 5, 1999] (Grundfest & Perino).)

According to the authors of the Stanford study, the migratory trend from federal to state courts is driven by efforts of the plaintiffs' securities class action bar to evade the litigation hurdles the Reform Act placed in the path of such suits. The evidence presented, the study's authors concluded, "suggests that the level of class action securities fraud litigation has declined by about a third in federal courts, but that there has been an almost equal increase in the level of state court activity, largely as a result of the 'substitution effect' whereby plaintiffs resort to state court to avoid the new, more stringent requirements of federal cases." (Grundfest & Perino, *supra*, at pt. XI, Conclusions and Policy Issues.)

Under California law, nothing comparable to the provisions of the Reform Act—intended both to make abusive securities strike litigation more difficult to mount and sustain, and to further the declared congressional policy of a national securities market—would apply to class action securities fraud suits filed in our courts. Blue sky suits can thus continue to be financed and controlled by the same handful of class counsel whose "appearance ratio" has climbed significantly since passage of the Reform Act. (Grundfest & Perino, *supra*, at pt. VII, Appearance Ratio of Plaintiff Law Firms.) The Reform Act's mandatory freeze on discovery imposed by the Uniform Standards Act would not apply to state blue sky suits either. Indeed, class counsel's use of state blue sky statutes as a device to evade the Reform Act's provisions has already been documented. Observers point to the increasingly common practice of filing parallel securities fraud class action suits—one in state court, another in federal court—as a means of evading the Reform Act's mandatory discovery stay. (See, e.g., Grundfest & Perino, *supra*, at pt. XI, Conclusions and Policy Issues ["There has also been an increase in parallel litigation between state and federal courts in an apparent effort to avoid the federal discovery stay or other provisions of the Reform Act."].)

Just that kind of whipsaw evasion was apparently attempted in this case. (See *In re Diamond Multimedia Systems, Inc. Securities Litigation* (N.D.Cal., Oct. 14, 1997, No. C-96-2644-SBA) 1997 WL 773733.) The same conflict would seem to hold true for the Reform Act's enhanced, fact-specific pleading requirements and proportionate liability standard.

Although inferential, the conclusion is inescapable: if state courts resolutely ignore implied preemption principles, the effect of Congress's passage of the Reform Act will be to offer securities plaintiffs and their class counsel a "safe harbor" from which to evade the effects of the Reform Act. And that is exactly what has happened. Congress is now aware of the trend toward circumventing the Reform Act's impediments to securities class action litigation by migrating to state courts as the forum of choice. Indeed, Congress has acted with unusual speed to pass legislation precluding state court forum-shopping by securities class action counsel. The Uniform Standards Act *expressly* preempts state laws in conflict with the standards prescribed by the Reform Act.

The effect of the uniform standards legislation, however, is itself "forward looking." The question thus becomes whether a small population of securities issuers, cut off from the express effects of the Uniform Standards Act, has been marooned: deprived of the benefits of Congress's dual policy of furthering a national securities market while deterring abusive securities class action litigation. In other words, the relevant inquiry now is not, as plaintiffs argue, whether California's Act applies to extrastate transactions. Congress has *expressly* preempted state securities laws as of November 1998 with the enactment of the Uniform Standards Act. Before that date, however, Congress had *impliedly* preempted state blue sky provisions, including California's, that are in "irreconcilable conflict" with the provisions of the Reform Act itself.

The similarities between the case before the New York Court of Appeals in *Guice, supra,* 89 N.Y.2d 31 [674 N.E.2d 282], and this case are not only compelling, they point to the same conclusion. Just as the 1975 amendments to the Securities Exchange Act "were intended to give the SEC the power administratively to develop a 'coherent and rational regulatory structure to correspond to and to police effectively the new national [securities] market system' [citation]," so, 20 years later, the provisions of the Reform Act were intended by Congress to continue the development of that same national securities market. (89 N.Y.2d at pp. 45-46 [674 N.E.2d at p. 289].) And just as the New York Court of Appeals reasoned that permitting the courts of each of the 50 states "to impose civil liability on national securities brokerage firms . . . for failure to meet more stringent [state] . . . standards" (*id.*

at p. 46 [674 N.E.2d at p. 289]) would defeat Congress's "purpose of enabling the SEC to develop and police [a] 'coherent regulatory structure' for a national market system," (*ibid.*) so fragmentation of the Reform Acts' express national standard into as many as 50 different state standards would wreak havoc on federal efforts to protect that market from abusive litigation practices.

As the United States Supreme Court said in rejecting a comparable scenario involving nuisance abatement suits under state law and the federal Clean Water Act, "It is unlikely—to say the least—that Congress intended to establish such a chaotic regulatory structure." (*International Paper Co.* v. *Ouellette* (1987) 479 U.S. 481, 497 [107 S.Ct. 805, 814, 93 L.Ed.2d 883].) The prospect of regulatory chaos raised by the *Ouellette* case, a prospect that would result from the efforts of one state to "do indirectly what [it] could not do directly—regulate the conduct of out-of-state [pollution] sources" (*id.* at p. 495 [107 S.Ct. at p. 813])—suggests that application of California's Blue Sky statutes in this case would also violate the commerce clause of the federal Constitution. (U.S. Const., art. I, § 8.)

The court's reasoning in *Edgar* v. *MITE Corp.* (1982) 457 U.S. 624 [102 S.Ct. 2629, 73 L.Ed.2d 269] (*Edgar*) explains why. A newly enacted Illinois antitakeover statute imposed a 20-day freeze on tender offers for shares of certain target companies (defined in terms of the target's contacts with Illinois residents). Because it favored target defenses, the 20-day freeze conflicted with the federal Williams Act (amending the Securities Exchange Act of 1934), which had no freeze period, and with Congress's declared policy of neutrality in takeover battles. In addition, provisions of the Williams Act laid down detailed rules intended to protect the interests of shareholders without "tipping the scales" in favor of the takeover company or its target. (*Edgar*, *supra*, 457 U.S. at p. 633 [102 S.Ct. at p. 2636].)

The court found that three provisions of the state antitakeover statute "upset the careful balance struck by Congress [in the Williams Act] and [that] therefore stand as obstacles to the accomplishment . . . of the full purposes and objectives of Congress." (*Edgar*, *supra*, 457 U.S. at p. 634 [102 S.Ct. at p. 2636].) Although states are free to regulate intrastate securities transactions, blue sky statutes that have "a direct restraint on interstate commerce and . . . a sweeping extraterritorial effect" are void under the commerce clause. (*Id.* at p. 642 [102 S.Ct. at p. 2640].) The court in *Edgar* went on to say that "the State has no legitimate interest in protecting nonresident shareholders" (*id.* at p. 644 [102 S.Ct. at p. 2641]) and that provisions of the Williams Act also duplicated substantive protection for shareholders provided in the state statute. (*Ibid.*) Because the Illinois statute

"imposes a substantial burden on interstate commerce which outweighs its putative local benefits," it was invalid under the commerce clause. (*Id.* at p. 646 [102 S.Ct. at p. 2642].)

The same considerations that led the court to declare the Illinois statute at issue in *Edgar, supra,* 457 U.S. 624, unconstitutional under the commerce clause apply here. And they point to the same result. As the opinion in *Edgar* observed, "[t]he Court's rationale for upholding blue-sky laws was that they only regulated transactions occurring within the regulating States." (*Id.* at p. 641 [102 S.Ct. at p. 2640].) The commerce clause, however, "precludes the application of a state statute to commerce that takes place *wholly outside of the State's borders*, whether or not the commerce has effects within the State." (*Id.* at pp. 642-643 [102 S.Ct. at p. 2641], italics added.) Like the constitutional limitations on a state's assertion of extraterritorial jurisdiction, "[i]n either case, 'any attempt "directly" to assert extraterritorial jurisdiction over persons or property would offend sister States and exceed the inherent limits of the State's power.' " (*Id.* at p. 643 [102 S.Ct. at p. 2641], quoting *Shaffer* v. *Heitner* (1977) 433 U.S. 186, 197 [97 S.Ct. 2569, 2576, 53 L.Ed.2d 683].)

## CONCLUSION

The majority's decision is at odds with the text and structure of the Act and a quarter-century's understanding that it does not extend beyond California's borders. Fearful, perhaps, that state courts would not give effect to an implicit intent by applying established preemption rules, less than two months ago Congress acted to *expressly* rule out application of conflicting state blue sky laws. For these defendants, congressional action comes too late. Cut off from the Uniform Standards Act, stranded by today's ruling, these unlucky few are left to fend for themselves. The concrete unfairness of that result is palpable enough; it is only heightened by this court's determination to ignore well-established principles governing implied preemption even in the face of the near unanimity among courts across the country in holding that similar 1975 amendments to the Securities Exchange Act preempted state laws in conflict with Congress's intent.

I dissent.

Chin, J., concurred.